[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-10382

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 20, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-20159-CR-ASG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JULIO ACUNA, a.k.a. Chino,
JOSE MIGUEL BATTLE, JR.,
a.k.a. Miguelito,
a.k.a. Jose R. Battle,
a.k.a. Jose Miguel Battle Rodriguez,
a.k.a. Jose Rodriguez Battle,
a.k.a. Jose Rodriguez Batlle,
a.k.a. Mike Battle,
a.k.a. Mike Jr.,

Defendants-Appellants,

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(February 20, 2009)

Before EDMONDSON, Chief Judge, and ANDERSON, Circuit Judge, and COHILL,[*] District Judge.

COHILL, District Judge:

In this organized crime enterprise, co-defendants Jose Battle, Jr. ("Battle, Jr.") and Julio Acuna ("Acuna") appeal their convictions and sentences on various grounds. The appellants contend that the district court made numerous errors, including: (1) denial of Battle, Jr.'s motion to dismiss the indictment on the grounds that it was barred by the statute of limitations; (2) responding to a jury question as to Battle, Jr.'s defense of withdrawal from the conspiracy by directing the jury to review the instructions again and reformulate the question if it wished;(3) upwardly departing prior to imposing sentence on Battle, Jr.; (4) imposing sentences on both defendants that were unreasonable in light of the factors enumerated in 18 U.S.C. § 3553(a); and (5) entering a forfeiture order as to Battle, Jr. that was grossly disproportionate to the offense.[1]

---

[*] Honorable Maurice B. Cohill, Jr., United States District Judge for the Western District of Pennsylvania, sitting by designation.

[1] Having carefully reviewed the record, we reject without further discussion appellants' additional contentions concerning: (1) the admission of out of court testimony of two unavailable witnesses, Idalia Fernandez (deceased) and Carlos Hernandez (mentally ill); (2) the admission of evidence against Acuna regarding the murder of Ernesto Torres; (3) the admission of evidence of Battle, Jr.'s monetary transactions conducted from 2000 through 2002 involving Aztec, Voltaire and El Zapotal.

For the reasons set forth below, we will affirm both convictions and sentences.

## I. PROCEDURAL BACKGROUND

On May 31, 2005, a federal grand jury indicted the defendants and others in a one-count superseding indictment charging them with Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy, specifically, a conspiracy to violate 18 U.S.C. 1962(c) by unlawfully conducting and participating in the conduct of a criminal enterprise through a pattern of racketeering activity, and the collection of unlawful debt, all in violation of 18 U.S.C. § 1962(d). The superseding indictment charged Jose Battle, Sr. (Battle, Jr.'s father), Battle, Jr., and Acuna, among others, with engaging in illegal activities through a large-scale, international enterprise known at various times as the "Cuban Mafia" or the "Corporation" which operated in the United States, the Caribbean, Europe, and Central and South America. The superseding indictment charged that: (i) the Corporation was an enterprise as defined by 18 U.S.C. § 1961(4), whose members functioned for the common purpose of achieving the illicit objectives of the Corporation, and (ii) the activities of the Corporation affected interstate and foreign commerce. The indictment further alleged that the Corporation was run by a Godfather (the Padrino), a Vice Chairman, and a Counselor (Consejero), and was

operated by groups known as Divisions and Crews, each of which had Lieutenants, Soldiers and Operators. Criminal activities such as gambling, money laundering, and enforcement, were conducted within geographic areas. "Enforcers" of the Corporation enforced discipline, intimidation of competition and induced fear of physical and financial injury to members of the Corporation as well as outsiders.

Jury selection began on January 9, 2006, and after a trial lasting more than five months, the jury returned its verdict on July 20, 2006. Battle, Jr., Acuna and Manuel Isaac Marquez were found guilty of conspiracy to commit racketeering. The verdict specified their liability as to the predicate offenses charged. The court sentenced Acuna to a life term and entered a $1.4 billion money judgment against him. Battle, Jr. was sentenced to 188 months' incarceration and three years' supervised release and ordered forfeiture of various assets. The court also entered a RICO forfeiture judgment of $642 million as to Battle, Jr. representing gambling profits the enterprise had earned from 1979 through 1988. The defendants now appeal.

## II. FACTS

A. THE ENTERPRISE STRUCTURE AND OPERATION

We will describe the entire operation here in some detail, as this is necessary

when considering the reasonableness of the sentences imposed by the district court.

1. Bolita

The Defendants were part of an organized crime enterprise (the Corporation) that ran "bolita," a numbers gambling operation in New York and New Jersey. The organization was devoted to making as much money as possible – especially for those at the top – through numerous bolita gambling locations. It also existed to protect that money by any means necessary. The indictment charges that the conspiracy began in 1964, and involved the commission of a variety of predicate acts, including murder, arson, and money-laundering. Jose Battle, Sr. was at various times the head of the Corporation and was the father and co-defendant of Battle, Jr., who also played a leadership role for a certain period of time. Battle Sr. plead guilty, but he died after he was sentenced. Acuna was a long-time confederate of Battle, Sr., who acted as Battle Sr.'s bodyguard and worked as an "enforcer" for the organization.

In the beginning Abraham Rydz and fellow Cuban emigres, including Battle Sr., Juan Mojica, and Humberto Davila, operated separate bolita operations in New York and New Jersey. Over time, Rydz became a partner of Mojica, who had moved to Spain, Antonio Rodriguez, who lived in Florida, and Luis Tinta. Rydz and Tinta managed 40 bolita "spots" (a location such as a business or store where a

bolita worker took bets, also known as a "store" or "bank") that collected over a million dollars in bets per week. Davila's bolita operation, known as the "Company," rivaled Battle Sr.'s Corporation. The Corporation's enforcers would ensure compliance with the "two-block rule" (that a new spot could not be opened within two blocks of a competitor's existing spot) by first issuing a warning to business owners and workers; if unsuccessful, enforcers would then resort to such tactics as destruction of property, arson, assault, extortion, and murder.

In 1977, Battle Sr. and Acuna were tried for the murder of Ernesto Torres, a former Corporation employee. Torres had left the organization because of a dispute with Battle, Sr. over his own outside gambling activities, which Battle, Sr. believed were inconsistent with the interests of the organization. Torres also owed the organization bolita money that he had collected as a banker. After Torres kidnapped and killed one of the Corporation's bankers, Acuna and Battle, Sr. tracked Torres down in Florida, where he was living with his girlfriend Idalia Fernandez. Acting under the direct orders of Battle, Sr. Acuna entered the apartment, shot and wounded Fernandez while she watched television in the living room, and following a shootout with Torres, shot and killed him in the bedroom closet.

The deposition testimony of two witnesses from that murder trial, Carlos

Hernandez and Idalia Fernandez, was read into the record in the instant case. Within weeks of being deposed, Fernandez was shot to death in New York.

Battle, Sr. plead guilty to conspiracy to murder Torres and the charges against Acuna were dismissed.[2] Upon release from prison in late 1979, Battle, Sr. began working with his son, who in a sense, had been "tutored" in the bolita business by Rydz at Battle, Sr.'s request. Manuel Marquez, Sr., his uncle, helped run the operations. Rydz asked Battle, Jr. if he could represent that they were partners so that Battle, Sr.'s reputation would afford Rydz's some protection. Battle, Jr. agreed. Rydz's partners wanted to retire, and Rydz, needing protection, agreed to merge his bolita operation into the Battles' smaller business. At that point, Rydz, Battle, Jr. and Battle Sr. each received 16% of the profits, and Marquez was paid a percentage of the business as a salary.

This combined organization operated in Queens, the Bronx, Brooklyn and in portions of Manhattan. Battle, Sr. confided to Rydz that he had gone to Miami in 1976 in order to get rid of Torres, and that he would also like to get rid of Fernandez, who had been with Torres when he was murdered. Battle, Sr. later told Rydz that Fernandez had to be "disappeared" because she had witnessed Torres'

---

[2] Specifically, Battle, Sr. was convicted on conspiracy and solicitation counts, but on appeal, the conspiracy charge was dismissed and the solicitation counts were reversed; he later pleaded guilty to conspiracy and was sentenced to 33 months' probation with credit for time served. Acuna had absconded after the 1977 Torres murder charge; he was arrested in 1984.

murder and had testified against Battle Sr. in his murder trial. (Fernandez had testified that on June 16, 1976, after she and Torres fled to Florida, that Acuna broke into their Hialeah, Florida apartment, shot her in the face and chest, and, when she awoke, she discovered Torres had been killed.)

Rydz and Battle, Jr., now allies, moved to Miami in 1982, and Battle Sr. likewise relocated there. Battle, Sr. set up a 20-acre farm called "El Zapotal." While Marquez managed bolita operations on a day-to-day basis, Rydz and Battle, Jr. called Marquez and others in New York on a daily basis, checking on operations and managing the business. Rydz and Battle, Jr. traveled to New York at least twice a month to review gambling records and reports, claim their percentage of profits in cash, and make management decisions. Employees of the enterprise transported millions in cash from New York to Miami and delivered the money to Battle, Jr., Rydz, and Battle Sr. and later, to Marquez, after he relocated to Florida.

The testimony at the trial in the instant matter showed that the enterprise expanded quickly to the point where by 1988, it operated 250-300 spots and 12-15 offices for processing bets, counting cash and keeping records. It involved the use of bankers who, in exchange for operating spots, would be reimbursed for operational overhead, would be provided protection, and would receive a portion of the profits.

Competition with Davila increased. In response to Davila's establishment of competing spots in violation of the two-block rule, the enterprise began an arson campaign, burning out spots in order to protect its share of the business, maintain the respect of its competitors and preserve the loyalty of its bankers and employees. The enforcers were paid to commit bodily harm, arson, and murder. From 1983 through 1984, one enforcer paid a thug for 30 to 35 arsons of rival bolita spots. Some arsons resulted in deaths. The Corporation established an account called "UNESCO" to pay for these arsons and other enforcement actions, including bail and legal defense of enterprise employees or associates. Battle, Jr. did not favor the arsons and preferred to negotiate when the two-block rule was violated; in fact, Battle, Jr. never authorized an arson before it was committed. Nevertheless, both Rydz and Battle Jr. continued to receive bolita profits while the arson campaign raged on and for years thereafter. Acuna served as Battle Sr.'s bodyguard and personal assistant. He also worked as an enforcer, collecting money from delinquent debtors, sometimes by force.

2. Money Laundering

The evidence at trial further established the laundering of the enterprise's bolita proceeds. Battle, Jr., Rydz, Battle, Sr., Marquez and others – with the help of the accountant for the criminal organization, Orestes Vidan – concealed the

9

enterprise's proceeds in domestic and foreign bank accounts and foreign corporation's bank accounts (located in Panama and Curacao). Battle, Jr. and his co-conspirators used nominee names or "front men" to hide the true identities of the owners of the money. The main persons used as nominees or "front men" for these foreign corporations were Vidan and Maurilio Marquez, the brother of Marquez, Sr. Marquez, Sr., Rydz, and Battle, Jr. each had foreign bank accounts set up in Switzerland. The money was either wire transferred to the Swiss accounts through nominee accounts in the names of Vidan and Maurilio Marquez, or was body carried directly to Switzerland. They also invested their bolita earnings in real estate or otherwise legitimate businesses to avoid arrest, hide the illegal source of their wealth, and provide for their children. One such business was Union Financial Research ("UFR"), a mortgage company located in Florida, where Battle, Jr. and Rydz worked and in which they had acquired a 25% interest. Another was a clothing manufacturing business.

Cash from the Corporation's illegal gambling operations was also physically carried by members of the conspiracy to Panama, where it was deposited into various foreign bank accounts in the names of various foreign corporations. The most significant of these foreign corporations were Panamanian corporations, Voltaire Trading and Investment Corporation ("Voltaire") and Aztec Financial

10

Enterprises, Inc. ("Aztec"), both of which were incorporated in Panama and utilized to invest in real estate in south Florida, and Stanara N.V. ("Stanara"), which was incorporated in the Netherlands Antilles.

One of the primary money laundering schemes was to transfer the money as "loans" from the foreign corporations to a series of domestic corporations which were partially or wholly owned by members of the criminal enterprise. These corporations would then pay members of the Corporation large salaries. The first one of these domestic corporations was UFR, the mortgage company incorporated in Florida.

In 1983 Rydz and Battle, Jr. were stopped at JFK airport carrying $500,000 in bolita cash that they had obtained from Marquez in New York. The cash was seized. Battle, Jr. was carrying a report of bolita business for the week of April 2, 1983, which listed $2,173,448 in assets and possibly accounts receivable, and the contents of the UNESCO account. The publicity surrounding the seizure caused the bank which had loaned $20 million to UFR to demand the identity of the source of the funds which Battle, Jr. and Rydz had loaned the company. This, in turn, caused Rydz and Battle to cash out of UFR. This return of capital contributions were transferred by Vidan through various foreign bank accounts and ultimately wound up in Union Bank of Switzerland accounts belonging to Battle, Jr. and

11

Rydz.

The evidence at trial also showed that several domestic clothing manufacturing businesses were involved in the manufacturing and sale of women's clothing to further launder illegal gambling proceeds. In order to buy into these domestic companies, Rydz and Battle, Jr. received money in the form of "loans" from another puppet company, Stanara Company Corporation ("Stanara Corp.") Battle and Rydz also laundered bolita proceeds through commercial real estate corporations which held accounts oversees.

The Corporation also utilized companies to purchase real properties in Florida, construct multi-million dollar homes on the properties, and then "lease" the residences to the owners of the illegal gambling money. This included Voltaire's purchase of 350 Island Drive, Key Biscayne, Florida, using Battle, Sr.'s bolita proceeds; this house was leased by Voltaire to Battle, Jr.'s mother in 1984. Battle, Jr. eventually sold the house for $1.9 million in 2001. Of this, $281,000 received at closing was deposited in Voltaire's account at Ocean Bank, most of which was later wired to Marquez's account in Curacao, and then to a Swiss account owned by Battle, Jr. Voltaire held a $1.3 million balloon mortgage on the house from the buyer, and Battle, Jr. ordered that this mortgage be assigned to Key Financial Services in return for $150,000. Battle owned stock in Key Financial

Services, which received interest payments on the house, $285,000 in cash, and then took a loss on the sale in 2002.

Similarly, in 1984 Rydz and Marquez purchased real estate at 730 and 740 Mashta Drive, Key Biscayne, through a Panamanian corporation, Aztec Financial Enterprises; the money came from UFR proceeds as well as other Panamanian accounts containing bolita proceeds. Marquez later transferred title to lot 730 to Battle, Jr.

Rydz and Battle, Jr. supervised the enterprise's bolita operations in New York and New Jersey until early 1989. At a funeral for a family member, Rydz and Battle both expressed to other bolita managers their desire to retire from daily bolita operations. Luis Perez testified that Rydz took a small calendar out of his pocket on which a date was circled, and told a fellow corporation member, "This is the day I'm leaving. Have my totals ready." However, the government maintained at trial that Rydz and Battle, Jr. continued to launder their own and the enterprise's bolita proceeds long after ending their direct involvement in the gambling operation.

Battle, Jr. delayed construction on his Florida residence until 1994; ultimately, Battle, Jr. and Rydz leased the houses from Aztec, after using various corporate accounts, rather than their own names, to finance construction of the

13

houses. Marquez had moved to Florida in 1985 and reviewed bolita reports and visited the various offices until the end of 1995, when he fled to Spain. Battle, Jr. had planned to move to Spain and was beginning to move his bolita money to the Canary Islands. Rydz sold the property located at 740 Mashta Drive for $2,717,500 on June 4, 2001; Battle, Jr. sold 730 Mashta Drive on May 8, 2002. Aztec received $2,128,664.98 at closing for 740 Mashta Drive and $2,866,311.66 at closing for 730 Mashta Drive. At Battle, Jr.'s direction, Vidan deposited these proceeds in Aztec's account at Plantars Bank, then wired $2,400,000 to a corporate account in the Canary Islands.

The Curacao corporation's accounts remained active for some time. In August and September of 1998, it wired $903,000 to Rydz's and Battle, Jr.'s accounts in Switzerland, which were never closed, and in 2000 it wrote certain small payment checks to pay for corporate registration and such.

The daily management of the enterprise's bolita business was conducted by Willie Pozo, and by 1996, the bolita's profits had decreased. From 1985 through 1995, the Corporation took in $2 million in bets weekly; in contrast, from 1995 through 2003, the total diminished to $700,000 weekly. In early 2000, Battle, Sr. threatened to kill Pozo and an associate in order to "take his business back." Marquez continued to receive a share of the Corporation's illegal gambling profits

14

until 2001. The enterprise's central bolita office was managed by Luis Perez, who was arrested in the summer of 2003. When Rydz and Battle, Jr. were arrested in March 2004, they were still receiving money from the commercial real estate business in Miami. The corporate tax returns for El Zapotal, Battle, Sr.'s 20-acre farm in Miami, showed that in 1999, Battle, Sr. gave El Zapotal to Battle, Jr. and his family as a gift, and that corporate returns had been filed from 2000-2002, listing Battle, Jr. as the largest shareholder.

## B. PROCEDURAL HISTORY

On May 31, 2005, the grand jury returned a one-count, fifth superseding indictment which charged that from 1964 until the return of that indictment, appellants Battle, Jr. and Acuna, and codefendants Battle, Sr., Manuel Isaac Marquez, and other named co-conspirators, were employed by and associated with an international criminal enterprise and conspired to violate 18 U.S.C. § 1962 (c) by unlawfully conducting and participating in the conduct of the enterprise's affairs through a pattern of racketeering activity, and the collection of unlawful debt, all in violation of 18 U.S.C. § 1962(d). The superceding indictment charged that the objectives and purposes of the Corporation included, but were not limited to, enriching its members through money laundering and the operation of illegal

15

gambling businesses, prevention of the detection of its criminal activities, and preserving its operations and profits through the use of violence and destruction, including but not limited to, acts of murder, arson and assault. The indictment alleged that Acuna was an "enforcer" for the corporation who committed acts of violence and murder on behalf of the enterprise, and that he subsequently became a "Jefe" or boss. The indictment also provided notice of specific acts which would result in enhanced sentences; it charged that Acuna and codefendant Battle, Sr. murdered Torres in 1976.

The superseding indictment charged two alternative theories of liability: (1) engaging in a pattern of racketeering activity which included acts and threats involving murder, arson, illegal gambling, operation of illegal gambling businesses, conspiracy to launder monetary instruments, and use of interstate and foreign commerce facilities in the commission of murder for hire, in violation of federal or state law, in violation of 18 U.S.C. § 1961(1); and (2) collection of unlawful debts incurred and contracted illegal gambling activity, in violation of 18 U.S.C. § 1961(6). The government also sought forfeiture of numerous assets alleged to have been acquired and maintained in violation of 18 U.S.C. §1962, and sought the imposition of an approximately $1.4 billion money judgment, pursuant to 18 U.S.C. §§ 1963(a)(1), (a)(2) and (a)(3).

16

The superseding indictment originally alleged as predicate acts conspiracy to murder and the murder of Idalia Fernandez, the murder of Ernesto Torres, and the murder of Jose Enriquez. However, at the close of the government's case, the court found there was insufficient evidence with regard to certain of the defendants' personal participation in numerous predicate acts. United States v. Battle, Jr., 473 F.Supp.2d 1185 (S.D. Fla. 2006). Thus, the court ruled that the murder of Ernesto Torres and conspiracy to murder Idalia Fernandez could be considered only against Acuna. (The government subsequently struck the predicate act alleging the murder of Idalia Fernandez.) The court also ruled that arson and murder by arson could only be considered against Battle, Jr. and co-defendant Marquez; that money laundering through a casino could only be considered against Marquez; that gambling activity that occurred after Marquez and Battle, Jr. had stopped receiving gambling profits could not be considered against them as predicate acts, but could be considered to prove the continuity of the enterprise; and that only illegal gambling activities alleged to have been committed from 1977-1988 could serve as predicate acts of Battle, Jr.'s gambling. The court also ruled that the government could proceed only under the theory that the defendants had agreed to personally participate in the commission of two or more predicate acts, and could not prove their participation in the conspiracy by showing that they had agreed only to the

17

conspiracy's overall objective.

The trial in this matter commenced on January 9, 2006, and codefendants Jose Aluart, Argelio Jimenez, Battle Sr.,[3] and Gustavo Battle entered guilty pleas. The case against Acuna, Battle, Jr. and Marquez proceeded to verdict. Defendant Battle, Jr.'s motion for judgment of acquittal on the grounds of statute of limitations was denied.

During deliberations the jury asked the following question: "After the withdrawal from the conspiracy, does the use of ill-gotten funds create a continuance of the conspiracy?" After hearing argument from counsel, the court refused to answer the question, asked the jury to reformulate the question and referred the jury to the instructions as originally given. The jury did not reformulate the question. All three defendants were convicted on July 20, 2006 under both theories of liability. The jury also entered a verdict on the forfeiture count in the amount of $1.4 billion.

### III. ISSUES AND STANDARDS OF REVIEW

The first issue before us is whether Battle, Jr.'s prosecution was barred by the statute of limitations based upon his claim that he withdrew from the

---

[3] Battle, Sr. was sentenced to 240 months' imprisonment and 60 months' supervised release and the forfeiture of his interest in certain property consistent with the terms of his plea agreement. He died several months after sentence was imposed.

18

conspiracy and did not participate in the daily operational affairs of the Corporation beyond March 16, 1999. Whether there is sufficient evidence to support a conviction is a question of law which this Court reviews de novo. See United States v. Majors, 196 F.3d 1206, 1210 (11th Cir.1999). The relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The court's refusal to give a supplemental jury instruction is reviewed for an abuse of discretion. United States v. Cunningham, 194 F.3d 1186 (11th Cir. 1999).

Secondly, we must also decide whether the court correctly determined Battle, Jr.'s and Acuna's sentences. These are reviewed for "reasonableness" using the factors outlined in 18 U.S.C. § 3553(a). Factual findings are reviewed for clear error; review is de novo when examining the sentencing court's application of the United States Sentencing Guidelines. United States v. Williams, 456 F.3d 1353 (11th Cir. 2006).

## IV. DISCUSSION

A. THE STATUTE OF LIMITATIONS

There is a 5 year statute of limitations for a RICO violation. 18 U.S.C. §

3282; United States v. Pepe, 747 F.2d 632, 664 (11th Cir. 1984).  The defendants were indicted on March 16, 2004, therefore, they must have participated in the RICO conspiracy until at least March 17, 1999 in order for their prosecutions to be timely.  Battle, Jr. argues that the district court erred when it denied his motion for judgment of acquittal, see U.S v. Jose Battle, Jr., et al., 473 F.Supp.2d 1185 (S.D. Fla. 2006), and that it abused its discretion and committed reversible error when it refused to answer the jury's question:  "After the withdrawal from the conspiracy, does the use of ill-gotten funds create a continuance of the conspiracy?"

The law of this circuit is that "a conspirator's participation in a conspiracy is presumed to continue until all activity relating to the conspiracy is ceased. Accordingly, [each defendant] is presumed to be a participant for the duration of the conspiracy unless he can overcome the presumption by proving his withdrawal."  United States v. LeQuire, 943 F.2d 1554, 1563-64 (11th Cir. 1991) (citation omitted).  Furthermore, "[w]ith respect to conspiracy statutes that do not require proof of an overt act, the indictment satisfies the requirements of the statute of limitations if the conspiracy is alleged to have continued into the limitations period."   United States v. Gonzalez, 921 F.2d 1530, 1548 (11th Cir. 1991) (citation and quotation marks omitted).  "The conspiracy may be deemed to continue as long as its purposes have neither been abandoned nor accomplished. Furthermore, the

conspiracy is presumed to exist until there has been an affirmative showing that it has terminated." Id. (citations and quotation marks omitted); see also United States v. Wong, 40 F.3d 1347, 1367 (2d Cir. 1994) (no predicate acts within the five-year period required for RICO conspiracy as long as defendant has not withdrawn); United States v. Torres Lopez, 851 F.2d 520, 524-25 (1st Cir. 1988) (same).

To establish the affirmative defense of a withdrawal from the conspiracy, the defendant has the substantial burden of proving: (1) that he has taken affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or to defeat the objectives of the conspiracy; and (2) that he made a reasonable effort to communicate those acts to his co-conspirators or that he disclosed the scheme to law enforcement authorities. See LeQuire, 943 F.2d at 1564; United States v. Finestone, 816 F.2d 583, 589 (11th Cir.), cert. denied, 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987). "A mere cessation of activity in the conspiracy is not sufficient to establish withdrawal." Id.

As to the second prong, it is undisputed that Battle, Jr. did not disclose the scheme to law enforcement, but rather, he made it known to his co-conspirators that he wanted to quit his involvement in bolita. This happened in November 1988 when he, along with Rydz, announced at a funeral that they wanted to end their involvement in the demanding daily operations and cease receiving money from the

bolita operation.   Prior to that time they were heavily involved in monitoring every

aspect of the numbers racket, which was a work-intense cash business.   Battle, Jr.

maintains that because  he withdrew from the conspiracy in 1988, any acts

committed by him to conceal the existence of the conspiracy after withdrawal do

not extend the conspiracy as to him.  United States v. Knowles, 66 F.3d 1146,

1155-1156 (11th Cir. 1995).  The vast majority of Battle, Jr.'s money laundering

pre-dated the March 17, 1999 statute of limitations cut off.  Battle argues that

spending his ill-gotten gains (what he calls "personal money laundering" and which

he admits conceals *his* "prior" criminality) does not defeat his withdrawal from the

conspiracy.  According to Battle, Jr., no evidence showed that he laundered any

then-active Corporation members' money after November of 1988, or that he

laundered the Corporation's money after that date.

At first blush, the case law seems to support this argument.  For example, in

Knowles, the defendant was an attorney who aided a co-conspirator by secretly

facilitating a large cash payment for a drug delivery.  Both defendants were found

guilty of conspiracy to import and distribute drugs even though the attorney,

Knowles, played no overt role in actual importation or distribution of drugs.  Judge

Clark explained:

The Supreme Court has unambiguously held that acts of

concealment are not part of the original conspiracy . . .
Concealment of the enterprise "indicate[s] nothing more than that
the conspirators do not wish to be apprehended – a concomitant,
certainly, of every crime since Cain attempted to conceal the murder
of Abel from the Lord." Thus, if Knowles' actions lead to no more
than an inference that he was attempting to conceal the conspiracy,
we would be compelled to reverse the conviction.

Id., citing Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931

(1957).

In United States v. Starrett, 55 F.3d 1525 (11th Cir. 1995), as evidence of

his withdrawal from the Outlaws gang, which was indicted on July 29, 1986,

defendant Duke offered the following: he added a 1980 "out date" to his Outlaw

Charlie tattoo; he sold his motorcycle; he joined a church and got a job; and he

moved out of Florida and "cut off virtually all contact" with the Outlaws. This

Court explained that:

even if this evidence is sufficient to satisfy this circuit's first
requirement for proving withdrawal from a conspiracy-that he took
affirmative steps to disavow the conspiracy-it is insufficient to satisfy
the second requirement. Duke has not pointed to any evidence in the
record to indicate that he made a reasonable effort to communicate
his withdrawal to his co-conspirators, or that he disclosed the
Outlaws' criminal schemes to law enforcement.

Id. at 1550, citing LeQuire, 943 F.2d at 1564.

In answer to the above-cited case law, the government argues that this case is

different. Here, money laundering is one of the predicate acts and one of the goals

23

of the conspiracy. Concealment is an integral part of money laundering. The government's position is that Battle, Jr.'s acts of money-laundering occurring within the limitations period count as acts in furtherance of the conspiracy.

In response, Battle argues that his money-laundering activities involved *only his own* ill-gotten gains (not money from the continuing enterprise), and thus he was not actively engaged in the conspiracy. Otherwise, he argues, there is no way in which a member could have withdrawn from this conspiracy.

Withdrawal from the conspiracy is a permissible defense to an action brought under § 1962(d) when a defendant can prove she took affirmative steps, *inconsistent with the objectives of the conspiracy,* to disavow or to defeat the conspiratorial objectives. See United States v. Butler, 41 F.3d 1435, 1446 (11th Cir. 1995) (emphasis added) (noting continued participation in the conspiracy is presumed unless defendant takes affirmative steps inconsistent with the conspiracy). Additionally, the defendant must have either made a reasonable effort to communicate those steps to her co-conspirators or disclosed their scheme to law enforcement authorities. Id.; see also Starrett, 55 F.3d at 1550 (upholding rejection of defendant's withdrawal defense because he had not communicated his withdrawal to his co-conspirators or disclosed the scheme to law enforcement officials).

We find that Battle, Jr.'s mere cessation of one activity of the conspiracy– receipt of profits in exchange for overseeing the daily operations of bolita – is not sufficient to establish withdrawal from the entire conspiracy in this case. The defendant cites United States Supreme Court case precedent in which the court found that concealment did not continue the conspiracy. However, these cases are distinguishable because the conspiracy had actually ended and the objectives of the conspiracy had been met prior to the concealment.

In Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed 790 (1949), the trial court permitted the government to introduce a co-conspirator's statements about how the crime should be concealed. The question before the Court was whether such hearsay declarations could be introduced against one of the conspirators; the declarations in question were made by one named in the indictment as a co-conspirator after the main object of the conspiracy had been accomplished. The Court reversed the conviction, and rejected the government's arguments that the conspiracy was not ended since it included an implied subsidiary conspiracy to conceal the crime after its commission, and that the declarations were therefore still in furtherance of the conspiracy and binding on co-conspirators.

Similarly, in Grunewald v. United States, 353 US. 391, 77 S.Ct. 963, 1

25

L.Ed.2d 931 (1957), the defendants were convicted of conspiring to defraud the government in its administration of the tax code. They appealed their conviction on the grounds that the prosecution was barred under the statute of limitations because the conspiracy's goals were attained well before the limitations period had begun. The Indictment explicitly charged that part of the conspiracy was an agreement to conceal the conspirators' acts. Thus, the Court was faced with a criminal conspiracy and a continuation of the secrecy after the accomplishment of the crime. The Court reversed. In so doing, it expressed concern that "allowing such a conspiracy to conceal to be inferred or implied from mere overt acts of concealment would result in a great widening of the scope of conspiracy prosecutions, since it would extend the life of a conspiracy indefinitely." 353 U.S. at 402, 77 S.Ct. at 972, 1 L.Ed.2d .

In this case, however, the conspiracy had multiple objectives and continued long after Battle, Jr.'s alleged withdrawal. The Corporation was formed for the purpose of enriching mostly those people at the top of the organization, and those individuals continued to receive profits well after 1999. The evidence at trial showed that Battle, Jr. laundered money through real estate transactions and sham accounts after that date. He sold his house in 2001; title to that property was never put in his name so that the ownership interest – the source of the ill-gotten gains –

26

was hidden. After he left the bolita operation he continued to launder the money and put it in offshore accounts in the names of other people and entities with the unlawful purpose of protecting the ongoing conspiracy. From 1982-1984 at Battle, Jr.'s direction, $300,000 in Battle, Sr.'s bolita proceeds were sent from Panama to purchase 350 Island Drive in Key Biscayne, followed by $591,000 in bolita proceeds to build a house, which was leased by Voltaire in May 1984 to Battle, Jr.'s mother. Battle, Jr. sold that property in August 2001 for $1,900,000. The $281,000 received at the closing was deposited in Voltaire's account at Ocean Bank, and on August 2, 2001, $230,000 was wire-transferred to Maurillo Marquez' account in Curacao, then to Battle Jr.'s Alex Trust Swiss account at the Union Bank. The listed representatives of Voltaire were Vidan and Maurillio Marquez, however, the company was controlled by Battle, Jr. Consequently, through Voltaire, Battle, Jr. was laundering his father's share of illegal gambling proceeds. Voltaire held a $1.3 million balloon mortgage on the house from the buyer, and Battle, Jr. directed that Voltaire assign the mortgage to Key Financial Services in return for $150,000. Battle, Jr. owned stock in Key Financial Services, which received interest payments on the house, $285,000 in cash, and then took a loss on the sale in 2002.

Even if the monies that were laundered were actually individual profits from

27

the illegal bolita gambling of the Corporation, and no longer proceeds owned by the Corporation itself as an enterprise, as an associate and member of the Corporation Battle, Jr. facilitated and carried out the goals and objectives of the enterprise to conceal illegally obtained money through various money laundering ventures, and, in so doing, concealed, promoted, and protected the Corporation and its members and associates. In so doing, Battle, Jr. did not withdraw, he continued to carry out the goal and object of the Corporation, as alleged in the Superseding Indictment, to prevent the detection of its criminal activities by laundering the money:

> through various means, including using the PUPPET COMPANIES, and the transfer and commingling of illegal funds through and with other funds and accounts, as well as the creation and perpetuation of 'sham' businesses, investments, and employment positions that appeared to be legitimate but were, in fact, a covert method of money laundering, all as an instrument to promote their illegal activities, conceal their illegal proceeds and avoid their reporting obligations as required by law.

Superseding Indictment, page 13.

The Corporation was described as "an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Corporation." It was alleged that the Corporation enriched its members and associates through various forms of illegal activity including acts of money

28

laundering and that it undertook all steps necessary to prevent the detection of its criminal activities, and sought to prevent and resolve the imposition of any criminal and civil liabilities upon the Corporation and its members and associates. It also alleged that "members and associates" of the Corporation "did violate the money laundering laws of the United States through various means." This is exactly what happened here. Battle, Jr. took his money, as well as Rydz, Battle, Sr.'s and Marquez's, and with the aid of Vidan, laundered it in order to prevent detection of the Corporation's criminal activities.

## B. THE QUESTION FROM THE JURY

Finally, we are asked whether the court abused its discretion when, in responding to the jury's question with respect to the withdrawal defense, it directed the jury to review the instructions again and reformulate the question if it wished. Battle urged the court to answer this question "NO," pursuant to United States v. Adkinson, 158 F.3d 1147, 1160 n.23 (11th Cir. 1998). The government argued that the question was vague and that the court should instruct the jurors to review the instructions. The court told the jury it could not answer the question without making assumptions about what the jury had decided. He permitted them to reformulate the question and to review the Withdrawal Defense Instruction, as well

as the instructions as a whole. The court found, and the government argues on appeal, that <u>Adkinson</u> is not pertinent to the issue because <u>Adkinson</u> did not involve money-laundering as an activity, but rather concerned how the defendants had spent their ill-gotten gains (related to concealment), which was irrelevant to the main issue of the conspiracy in <u>Adkinson</u> (whether there was a bank fraud). There is no argument that the jury instruction as originally given was improper. The jury did not reformulate the question.

Based on our analysis as discussed <u>supra</u>, we find that the district court did not abuse its discretion in this regard.

## C. APPEAL OF ACUNA AND BATTLE, JR.'S SENTENCES

### 1. Acuna's Sentence

The jury found that Acuna committed numerous predicate acts as part of a pattern of racketeering activity, including several acts of gambling, conspiracy to murder and the murder of Ernesto Torres, and conspiracy to murder Idalia Fernandez. On appeal, Acuna argues that his life sentence is unreasonable in light of the 18 U.S.C. § 3553(a) factors, because the court failed to account adequately for his age, poor health, and low likelihood of recidivism.

"We review the sentence imposed by the district court for reasonableness."

30

United States v. Talley, 431 F.3d 784, 785 (11th Cir. 2005).  Reasonableness review

requires that the appellate court review the sentence under an abuse-of-discretion

standard.  Gall v. United States, __ U.S. __, 128 S.Ct. 586, 594, 169 L.Ed.2d 445

(2007).  As the Supreme Court recently instructed, we:

> must first ensure that the district court committed no significant
> procedural error, such as failing to calculate (or improperly
> calculating) the Guidelines range, treating the Guidelines as
> mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors,
> selecting a sentence based on clearly erroneous facts, or failing to
> adequately explain the chosen sentence – including an explanation
> for any deviation from the Guidelines range.

Id., ___ U.S. ___ , 128 S.Ct. at 597.  In providing a statement of reasons for the

sentence imposed, the district court "[s]hould set forth enough to satisfy the

appellate court that he has considered the parties' arguments and has a reasoned

basis for exercising his own legal decisionmaking authority."  Rita v. United States,

__ U.S. ____ , 127 S.Ct. 2456, 2468, 168 L.Ed.2d 203 (2007).

   If the district court's decision is procedurally sound, our analysis then turns

to the substantive reasonableness of the sentence.  See Gall, ___ U.S. at ___, 128

S.Ct. at 597.  "In reviewing the ultimate sentence imposed by the district court for

reasonableness, we consider the final sentence, in its entirety, in light of the §

3553(a) factors."  United States v. Thomas, 446 F.3d 1348, 1351 (11th Cir. 2006).

The § 3553 (a) factors include:

31

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.

Talley, 431 F.3d at 786 (summarizing 18 U.S.C. § 3553 (a)).  However, "nothing in Booker or elsewhere requires the district court to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors."  United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005).  Instead, an explicit acknowledgment that the district court has considered the defendant's arguments and the § 3553 (a) factors will suffice.  Id. at 1329-30.  "[T]he party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in light of both [the] record and the factors in section 3553(a)."  Talley, 431 F.3d at 788.

Nothing in the record suggests that the court committed clear error of judgment in weighing the § 3553(a) factors and arriving at Acuna's sentence.  The sentence is reasonable in light of the crimes he committed in furtherance of the RICO conspiracy, the need to provide just punishment, and the need to protect the

public.  The court explicitly found that the evidence established that Acuna was an enforcer for the enterprise and that he committed the murder of Torres and engaged in the conspiracy to murder Fernandez at the direction of Battle, Sr.

Here, Acuna has not met his burden of demonstrating that his within-range sentence is either procedurally or substantively unreasonable.  Therefore, we affirm.

2.  Battle, Jr.'s sentence

Battle, Jr. argues that the court erred in departing upward from the guidelines, and that the guideline range should have been 46 to 57 months' imprisonment; in light of his range, his 188 months sentence is unreasonable, he claims.  Battle, Jr. also argues that the forfeiture order is grossly disproportionate to his offense and, therefore, a violation of his rights under the Eighth Amendment.  Because he has not met his burden of demonstrating that his sentence is unreasonable in light of the record and the 18 U.S.C. § 3553(a) factors, we affirm.

Initially, Battle, Jr. faced a guideline range of 46 to 57 months.  The court, however, upwardly departed and sentenced Battle, Jr. to 188 months, and imposed a forfeiture money judgment in the amount of $642 million dollars against him.  Battle, Jr. now argues that the district court erred in departing from the guidelines, or in the alternative, the sentence was not reasonable in light of the 18 U.S.C. §

3553(a) factors. The district court plainly stated that it would have reached the sentence that it ultimately imposed based on its analysis of the § 3553(a) factors and independent of it resolution of the issues relating to Battle, Jr.'s guidelines calculations.

"After the Supreme Court's decisions in Booker and Gall, the district courts are still required to correctly calculate the advisory Guidelines range." United States v. Livesay, 525 F.3d 1081, 1089 (11ᵗʰ Cir. 2008). However, "[t]he Supreme Court and this Court have long recognized that it is not necessary to decide guidelines issues or remand cases for new sentence proceedings where the guidelines error, if any, did not affect the sentence." United States v. Keene, 470 F.3d 1347, 1349 (11ᵗʰ Cir. 2006); see Williams v. United States, 503 U.S. 193, 203, 112 S. Ct. 112, 1120-21, 117 L.Ed.2d 341 (1992) ("[O]nce the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed.").

Accordingly, we need not resolve disputed guidelines issues where the district court has stated, as it did here, that "the guidelines advice that results from the decision of those issues does not matter to the sentence imposed after the §

34

3553(a) factors are considered," and we conclude that "the sentence imposed through the alternative or fallback reasoning of § 3553(a) [is] reasonable." Keene, 470 F.3d at 1349. "In determining whether it is reasonable we must assume that there was a guidelines error – that the guidelines issue should have been decided in the way the defendant argued and the advisory range reduced accordingly – and then ask whether the final sentence resulting from consideration of the § 3553(a) factors would still be reasonable." Id.; see United States v. Dean, 517 F.2d 1224, 1232 (11th Cir. 2007) (applying Keene and holding that, assuming the district court erroneously calculated the defendant's guidelines range, the sentence nevertheless "was reasonable and stands despite the disputed guidelines issue").

In applying the standard of Gall, discussed supra, we find that Battle Jr.'s sentence was reasonable in light of the record and the factors in § 3553(a). The court considered the § 3553(a) factors and specifically detailed the nature and circumstances of the offense, Battle, Jr.'s history and characteristics, the need to promote respect for the law and provide adequate punishment, the seriousness of the RICO offense and Battle, Jr.'s underlying racketeering activities, and the need to avoid unwarranted sentencing disparities. The court stated that he played a leadership role in the enterprise which lasted over a very substantial period of time and was significant in scope. It further found that the amount of gambling

35

proceeds was "staggering"; we cannot dispute this as the government showed that the Corporation's gambling operations generated $1.4 billion in proceeds, $642 million of which were generated during the time period in which Battle received gambling profits. Moreover, the court stated on the record that it accounted for the sentences of co-conspirators who were only involved in the Corporation's money laundering activities, and not also in the gambling operations. We also note that Battle, Jr.'s 188-month sentence was well below the 240-month statutory maximum.

Here, Battle, Jr. has not shown that the court abused its discretion and imposed an unreasonable 188-month sentence, even with an assumed guidelines range of 46 to 57 months. As a result, we affirm without deciding the contested guidelines issues, because even if we resolved those issues in Battle's favor, the district court "has already told us that it would impose exactly the same sentence" based on the § 3553(a) factors and independent of its application of the guidelines. See Keene, 470 F.3d at 1350.

3. Battle, Jr.'s Forfeiture Order

In support of its verdict of guilty of conspiracy to commit racketeering, the jury found that Battle, Jr. committed eight predicate acts of money laundering, along with numerous predicate acts of, inter alia, gambling and conspiracy to

36

commit money laundering.  At the hearing on the issue of forfeiture, Detective

David Shanks testified to his review of the evidence that the government

demonstrated at trial the amount of money collected by the Corporation during

various parts of the RICO conspiracy.  He stated that in the time period from 1979

until 1980, the Corporation's gambling operations generated an average of

$175,000 per week and that during the period from 1981 until 1988, it generated an

average of $1.5 million per week.  Battle, Jr. was a leader of the Corporation's

gambling operations and until 1989, received a share of the gambling proceeds.

We also note that the jury entered a special verdict finding that the Corporation's

racketeering activities generated $1.4 billion in proceeds.

   "We review de novo the district court's legal conclusions regarding

forfeiture and the court's findings of fact for clear error."  United States v. Browne,

505 F.3d 1229, 1278 (11th Cir. 2007) (citations and quotations omitted), petition for

cert. filed U.S. March 17, 2008 ) (No. 07- 1190).  "Whether a forfeiture order is

constitutionally excessive under the Eighth Amendment is also subject to de novo

review."  Browne, 505 F.3d at 1278.

   An individual who violates § 1962 "shall forfeit to the United States . . . (1)

any interest the person has acquired or maintained in violation of [§] 1962 . . . and .

. . (3) any property constituting, or derived from, any proceeds which the person

obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of [§] 1962." 18 U.S.C. §§ 1963(a)(1) and (3). "Forfeitures are subject to the Eighth Amendment's prohibition against excessive fines 'if they constitute punishment for an offense[,]'" and "[s]ubject forfeitures violate the Excessive Fines Clause if they are 'grossly disproportional to the gravity of the defendant's offense.'" Brown, 505 F.3d at 1281 (quoting United States v. Bajakajian, 524 U.S. 321, 328, 337, 118 S.Ct. 2028, 2033, 141 L.Ed.2d 314 (1998)). "This, in turn, is determined by examining three factors: (1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." Browne, 505 F.3d at 1281 (summarizing Bajakajian).

As to these factors, Battle is "precisely the type of person toward whom RICO is principally directed . . ." because he committed racketeering activities, as the contemplated by the foreiture statute. Browne, 505 F.3d at 1282. Moreover, as to the second factor, the maximum sentence that could have been imposed was 20 years imprisonment, and the maximum fine was twice the amount of gross gain that Battle derived from the RICO enterprise. See 18 U.S.C. §§ 1963(a), 3571 (d). Unlike Bajakajian, these penalties suggest a significant level of culpability. See

524 U.S. at 338, 118 S.Ct. at 2038; see also Browne, 505 F.3d at 1282 ("That Congress authorized a maximum fine of $250,000 and 20 years' imprisonment each for Counts 1 and 2 further underscores that it viewed such violations as serious transgressions."). Turning to the third factor, the harm caused by Battle, Jr.'s involvement in this RICO enterprise was also significant. The jury found that he committed eight separate acts of money laundering, and this Court has observed that "[e]ach unlawful monetary transaction harms society by impeding law enforcement's efforts to track ill-gotten gains." United States v. Martin, 320 F.3d 1223, 1227 (11th Cir. 2003). The laundered funds were derived from illegal gambling operations, which involved numerous acts of violence targeted at rival businesses; Battle, Jr. was in a leadership position at the time such violent acts were committed and approved payments for such acts from the UNESCO account.

In sum, we find that the forfeiture order, albeit a huge sum, was not grossly disproportionate to the RICO offense, which at one point generated $1.5 to $2 million per week in gambling proceeds, and which involved acts of violence to protect gambling operations and acts of money laundering to conceal the unlawful funds derived therefrom. The court's $642 million forfeiture order was not grossly disproportionate to Battle's RICO offense. Therefore, we affirm.

**SENTENCES AND FORFEITURE ORDER AFFIRMED.**