[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14614
_____

D.C. Docket Nos. 1:11-cv-21991-ASG; 1:04-cr-20159-ASG-2


MANUEL ISAAC MARQUEZ, SR.,

Petitioner–Appellant,

versus

UNITED STATES OF AMERICA,

Respondent–Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 6, 2017)


Before JORDAN and JILL PRYOR, Circuit Judges, and COOGLER,[*] District
Judge.

_____

[*] The Honorable L. Scott Coogler, United States District Judge for the Northern District
of Alabama, sitting by designation.

COOGLER, District Judge:

Petitioner-Appellant Manuel Isaac Marquez, Sr. ("Marquez") appeals the district court's decision not to hold an evidentiary hearing before denying his 28 U.S.C. § 2255 motion to vacate, set aside, or correct his sentence. Marquez was convicted by a jury of violating the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961–1968, by participating in an organized crime enterprise involving twenty-nine predicate acts including murders, arsons, and illegal gambling operations, and sentenced to 240 months' incarceration. Though it denied his § 2255 motion, the district court granted Marquez's request for a certificate of appealability concerning whether his defense counsel was constitutionally ineffective at trial and on appeal. After thorough review of the record and briefs of the parties, and having the benefit of oral argument, we affirm the district court on all issues raised on appeal.

## I.

## A.

The following facts were established at Marquez's RICO trial. Marquez rose through the ranks of an illegal gambling organization that ran "bolita," a numbers game based upon published horse racing results. Jose Miguel Battle, Sr. ("Battle, Sr.") started the enterprise in the 1960s, dubbing it "The Corporation," and began operating in New York and New Jersey. At that time, there were other bolita

2

operations in the same areas, such as one owned by Abraham Rydz ("Rydz"), and a rival operation known as "The Company" operated by Humberto Davila ("Davila"). Each organization operated numerous "spots" or "banks," which were businesses or stores where a bolita worker took bets. The Corporation used "soldiers" or "enforcers" to intimidate small business owners into maintaining bolita spots, to check up on bankers who were under-reporting their earnings, and to enforce the "two-block" rule, an unspoken understanding among rival bolita operators that a new spot could not be opened within two blocks of a competitor's existing spot. These enforcers regularly destroyed property, assaulted and killed people, and occasionally "burned out" rivals to protect the Corporation's share of the bolita market and retain the respect and fear of its competitors and the loyalty of its bankers and employees. For many years, these operations were extremely lucrative for those at the top; for example, Rydz managed forty bolita spots that collected over one million dollars in bets per week.

In 1977, Battle, Sr., along with his long-time bodyguard and Corporation enforcer Julio Acuna ("Acuna"), were tried for the murder of one of the Corporation's former employees. Battle, Sr. pled guilty to conspiracy to commit murder and was imprisoned. Upon his release in late 1979, Battle, Sr. began working with his son, Jose Battle, Jr. ("Battle, Jr."), who had been "tutored" in the bolita business by Rydz at Battle, Sr.'s request. Marquez, who is Battle, Jr.'s uncle,

3

entered into the business at that time as well, helping Battle, Jr. run the daily bolita operations. At Rydz's request that Battle, Sr. provide him some protection from rival bolita operators, Battle, Sr. agreed to merge Rydz's larger bolita operation into the Battles' smaller business. Battle, Sr. reorganized the Corporation, with Rydz, Battle, Jr., and Battle, Sr. each receiving sixteen percent of the profits as owners and Marquez being paid a percentage of the profits as a salary. The combined organization operated in Queens, the Bronx, Brooklyn, and portions of Manhattan.

In 1982, Rydz and the Battles moved to Miami, and Marquez took over on-site management of the bolita operations in New York. Rydz and Battle, Jr. supervised Marquez through daily calls. They also traveled to New York twice a month to review gambling records and reports, claim their percentage of the profits in cash, and implement management decisions. Employees of the Corporation routinely transported millions in cash from New York to Miami, delivering the money to the Battles and Rydz, and later to Marquez, after he joined them in Florida in 1985.

Marquez and others within the Corporation went to ruthless lengths to enforce their policies, including the two-block rule. The Battles and Rydz set up an account called "UNESCO" to pay the costs of enforcing the compliance of the rule, including bail and legal defense. By 1983, the Corporation faced intense

4

competition from rival bolita organizations, causing Marquez to rely heavily upon Corporation enforcers Conrad "Lalo" Pons ("Pons") and Manny Guzman ("Guzman"). Consuelo Alvarez ("Alvarez") was employed as a bookkeeper for the Corporation for many years, working directly under Marquez. Guzman and Alvarez lived together from around 1978 to 1988. During that time, Alvarez regularly received cash from Marquez to give to Guzman and observed Marquez personally giving cash to Guzman at their apartment. She also heard Guzman and Pons discussing their enforcement work on an almost daily basis. Thus, Alvarez knew that the Corporation paid enforcers $1,500 to destroy property in a store, $2,400 to break legs, $15,000 for arson, and $25,000 for murder. Alvarez also knew that Marquez had ordered at least ten murders because she had to charge the expenses for them against accounts listed in the books.

In 1983, Battle, Sr.'s brother, Pedro, a waiter uninvolved in the Corporation, was killed, and Jose "Palulo" Enriquez ("Enriquez") was believed to be his murderer. Battle, Sr. put out a $100,000 contract on Enriquez's life. Rydz was approached by Earl Robinson ("Robinson"), a gambling associate, in Miami. Robinson told Rydz that he had a man who could kill Enriquez. Around the same time, Guzman told Alvarez that he had been told to find a competent assassin to kill Enriquez. One day, Guzman told Alvarez that Enriquez was in the hospital, and he showed her a hospital coat that he intended to use to get into the hospital, as

5

well as a silencer that Marquez had brought to his apartment for him (or someone else) to use to murder Enriquez. On October 7, 1983, Enriquez was found dead in his hospital bed with two bullet wounds to the right side of his head. The day after Enriquez's death, Battle, Sr. offered Rydz a glass of champagne to celebrate, and Rydz instructed Corporation employees to pay Robinson $100,000 from the UNESCO account. Several weeks later, Battle, Sr. gave Guzman and Pons two bottles of Dom Perignon for a job well done.

Alvarez also remembered an occasion in the 1980s when she overheard an operator of a Corporation spot in Brooklyn complain to Marquez and Battle, Jr. that he was being robbed every weekend, and that Guzman knew the robber. In the presence of Alvarez, Guzman made arrangements for the robber's murder and later told Alvarez that he had to hire someone to dispose of the robber's body. On another occasion in 1986, Alvarez observed Marquez leave money at her apartment for Guzman the day after Guzman told her that Battle, Sr. had instructed him to kill a woman on 90th Street because of "problems" with her husband.

In 1983 and 1984, Pons paid William Diaz ("Diaz") to set fires to thirty-five rival bolita spots to enforce the two-block rule against rival bolita operations such as Davila's. The testimonies of Diaz and a New York City medical examiner and pathologist established that these fires resulted in the deaths of eight men and women. Pons typically scolded Diaz when people died in the fires because their

deaths generated bad publicity and triggered criminal investigations. Marquez, however, shook Diaz's hand and told him that he was doing a fine job after he set a fire in Brooklyn, New York.

Guzman told Alvarez that he and Pons claimed responsibility for an arson at 410 West 56th Street in New York. After Pons was arrested for that fire, Marquez went to Alvarez's apartment and told Guzman to leave New York and that he would send his weekly salary to him. Guzman then fled to Puerto Rico and Alvarez was given money every week to send to him. Marquez also arranged for Pons's weekly salary to be paid to a business owned by Pons's brother-in-law while Pons was in jail. Marquez told Alvarez to charge these payments as expenses against the bolita spots that Guzman and Pons had been operating, which continued to bring in profits.

Rydz and Battle, Jr. generally attempted to negotiate with their rivals when the two block rule was violated, as they believed arson was bad for business and led to bad publicity and police investigations. Rydz was especially concerned after a newspaper reported the death of a child in one of the arsons, but when he questioned Marquez about it, Marquez replied, "What's done is done." Although Rydz and Battle, Jr. learned about the fires after the fact and advised Marquez to minimize them, they never ordered Marquez to stop using arson as an enforcement tactic.

7

The Corporation expanded to the point where by 1988, it operated 250 to 300 locations and had twelve to fifteen offices for processing bets, counting cash, and keeping records. At a family member's funeral on November 30, 1988, Rydz and Battle, Jr. announced they were retiring from the bolita operations. They collected their final bolita distributions in early 1989. Marquez, having had moved to Florida in 1985, continued to manage the operations by reviewing bolita reports and visiting Corporation sites and offices. Marquez began receiving a percentage of the Corporation's bolita profits as an owner in 1989. From 1985 through 1995, the Corporation continued to flourish, taking in $2 million in bets weekly.

Marquez and the other owners of the Corporation not only received direct profits from bolita operations but also laundered those proceeds in order to obscure the illegal source of their wealth and avoid arrest. This process began in 1982, when the Battles, Marquez, and Rydz, with the help of the Corporation's accountant, Orestes Vidan ("Vidan"), began concealing millions of dollars in bolita proceeds in bank accounts in Panama, the Netherlands Antilles, and other foreign nations. They used nominee names or "front men" to hide the true identities of the owners of the money. For example, Marquez's brother, Maurillo Marquez, was listed as a corporate director on some accounts.

The Battles, Marquez, and Rydz then invested the monies located in these foreign bank accounts into various entities. They set up domestic corporations to

purchase real estate in south Florida, constructed multi-million dollar homes on the land, and then "leased" the homes to themselves. For example, Marquez purchased his home in Key Biscayne, Florida, in this manner. They also transferred money as "loans" from the foreign accounts to a series of domestic corporations that were partially or wholly owned by members of the Corporation. These corporations would in turn pay Corporation members large salaries. These activities went on largely undetected, with the exception of an incident in 1983 wherein Rydz and Battle, Jr. were stopped at John F. Kennedy International Airport in New York transporting $500,000 in bolita cash that they had obtained from Marquez. The cash was seized. When stopped, Battle, Jr. was carrying a report of bolita business for the week of April 2, 1983, which listed $2,173,448 in assets and possibly accounts receivable, and the contents of the UNESCO account. The resulting publicity caused the bank that had loaned money to one of the Corporation's shell companies to inquire as to the source of the funds that Battle, Jr. and Rydz had loaned to the company, and consequently Battle, Jr. and Rydz were forced to cash out of that company and reinvest in other ventures.

In 1992, Marquez and Battle, Sr. also laundered bolita profits by investing them in a casino in Peru. After learning that another New York bolita operator, Luis DeVilliers ("DeVilliers"), had obtained a Peruvian casino license, Battle, Sr. forced DeVilliers to join him and several Venezuelan partners in investing in a

9

casino at the El Crillon Hotel in Lima. Maurillo Marquez had a Venezuelan passport and was listed as a shareholder on the corporate documents as a representative for Battle, Sr. and Marquez. Battle, Sr. used a different name while in Peru, as he did not want his name on any documents. To fund the casino, Battle, Sr. and Marquez obtained money directly from the Corporation's New York bolita operations, which infuriated Marquez's successor, Willy Pozo ("Pozo"), who was then the on-site manager of the bolita operations in New York. Pozo criticized the casino as a mistake and a disaster. The rest of the investment funds for the casino came from Battle, Sr.'s and Marquez's offshore bank accounts. DeVilliers's investment came from his own New York bolita business. Marquez, Battle, Sr., and DeVilliers had invested $4.7 million, in approximately equal shares, by the time the casino opened in 1993.

For the first several months, the casino had no competition and made $200,000 in profits each month. After that, it lost money, partly due to Battle, Sr.'s penchant for giving away gambling chips to Peruvian government and military officials. DeVilliers, Marquez, and Battle, Sr. arranged for friends and associates to carry cash to Peru in order to meet payroll expenses. Marquez and DeVilliers discussed how fortunate it was that their respective bolita operations in New York were able to finance their contributions.

In October 1994, when DeVilliers and Marquez attempted to sell the casino to a Canadian corporation, Battle, Sr. threatened DeVilliers to the point where DeVilliers refused to go to Lima and told Marquez to do whatever he wished with his interest in the casino. Against his better judgment, Rydz attempted to help Marquez and DeVilliers sell the casino and recoup their investments, but Battle, Sr. accused Marquez of betraying him and threatened to murder everyone involved. Rydz then told Battle, Sr. that the proposed sale was off, and he advised Marquez to hand over his interest to Battle, Sr. because the casino was a disaster. The casino closed in 1996.

By the late 1990s, Marquez owed $190,000 to the Corporation, which had greatly diminished due to increasing competition. From 1995 to 2003, the enterprise was only taking in $700,000 in bets per week. After learning that he was being investigated for murder, Marquez fled to Spain in 1999. In November of that year, pursuant to Marquez's instructions and through a power of attorney, Marquez's son sold Marquez's property in Key Biscayne and forwarded the profits to Marquez to fund his life in Spain.

In early 2000, after Pozo stopped making distributions to Marquez and Battle, Sr., Battle, Sr. threatened to "take his bolita business back" by killing Pozo and his associates. Regardless, the bolita operations continued under Pozo until a series of arrests were made in the summer of 2003.

11

In 2001, Battle, Jr. and Rydz sold their homes in south Florida, hiding the proceeds in their offshore accounts. When Battle, Jr. and Rydz were arrested in March 2004, they were still receiving money from at least one domestic corporation which had been acquired with bolita funds that had been invested and cashed out of other ventures.

**B.**

On March 16, 2004, a grand jury in the United States District Court for the Southern District of Florida indicted Marquez and 24 co-defendants on two counts: RICO conspiracy, in violation of 18 U.S.C. § 1962(d), and illegal gambling, in violation of 18 U.S.C. § 1955.

Two days later, Spanish authorities arrested Marquez in Madrid, pursuant to a provisional arrest warrant tendered by the United States to Spain in accordance with a bilateral extradition treaty, the Treaty on Extradition Between the United States of America and Spain, May 29, 1970, 22 U.S.T. 737. On May 12, 2004, the United States formally requested Marquez's extradition and attached the following in support: (1) the prosecutor's sworn affidavit; (2) a certified copy of the indictment; (3) a certified copy of the arrest warrant; (4) a copy of the applicable United States laws; and (5) the investigator's sworn affidavit, describing the acts of which Marquez was accused and the evidence upon which the accusations were based.

12

Marquez opposed his extradition in Spain, arguing, among other things, that there was no evidence to support the charges because the facts alleged in the investigator's affidavit were vague. He also contended that under the facts presented, the Spanish courts could not determine whether the charged conduct constituted a crime in Spain, including whether it would be barred by the applicable Spanish statute of limitations, which barred prosecution for crimes committed before 1999 unless they are found to be continuing crimes. After a hearing, a three-judge panel authorized Marquez's extradition. Marquez appealed to the Spanish National Criminal Court. That court *en banc* denied his appeal and authorized his extradition. The court rejected his argument that the facts in the extradition paperwork were vague, noting that the first charge "ma[de] reference to the actions of the petitioner at the heart of a mafia organization engaged in certain activities characteristic of organized crime" and that the second charge "refer[red] to the illegal gambling activities committed by the mafia organization to which the petitioner allegedly belongs." [Criminal Docket Entry No. 2687–2 at 3.] The Spanish court wrote that "the facts contained in the extradition request are perfectly definable under Spanish criminal law" and identified specific provisions of the Spanish Criminal Code that criminalized the same acts Marquez was charged with committing. [*Id.* at 4.] The court also wrote that under Article V of the extradition treaty, the statute of limitations did not bar Marquez's prosecution

13

so long as it was not barred in the United States. On April 4, 2005, Marquez was extradited to the United States and arrested on a warrant issued pursuant to the indictment. Pursuant to the terms of Marquez's extradition, twenty years' imprisonment was the longest sentence Marquez could receive if convicted in the United States.

On April 28, 2005, attorney Maria Del Carmen Calzon (hereinafter "counsel") entered a notice of appearance on Marquez's behalf. She was initially retained, but when Marquez became unable to pay her fees, the district court appointed her to continue representing him and receive compensation through the Criminal Justice Act, 18 U.S.C.A. § 3006A.

On May 31, 2005, the grand jury returned a one-count superseding indictment that removed the illegal gambling count and added collection of unlawful debt, *see* 18 U.S.C. § 1962(c), as an alternative theory of liability for RICO conspiracy in violation of 18 U.S.C. §1962(d), which became the only count. The superseding indictment charged Marquez and his co-defendants under two alternative theories: (1) engaging in a pattern of racketeering activity which included acts and threats involving murder, arson, illegal gambling, operation of illegal gambling businesses, conspiracy to launder monetary instruments, and use of interstate and foreign commerce facilities in the commission of murder for hire, in violation of federal or state law, and (2) collecting unlawful debt incurred and

contracted through illegal gambling activity. The indictment also demanded forfeiture of numerous bank accounts, real properties, and mortgage entitlements and payments.

The United States offered to recommend to the district court a twenty-year sentence of imprisonment in exchange for Marquez pleading guilty. Marquez did not plead guilty, and his trial began in January 2006 and lasted roughly six months. Marquez was tried with Battle, Sr., Battle, Jr., Acuna, and two other co-defendants, while other co-defendants were severed and tried separately. During the trial, the district court ruled that as to the first theory of liability in the indictment, the United States was required to prove personal participation in the conspiracy by showing that each defendant agreed to personally participate in the commission of two or more predicate acts. As to the second theory of liability, the district court ruled that the United States could prove collection of unlawful debt by showing that each defendant either had agreed to personally participate in the collection of unlawful debt or had specifically intended to otherwise participate in the affairs of the enterprise with the knowledge and intent that co-conspirators would conduct the enterprise's affairs through the collection of unlawful debt.

Most of Marquez's co-defendants, including Battle, Sr., entered guilty pleas during the trial, leaving only Marquez, Battle, Jr., and Acuna to proceed to

15

verdict.[1] Alvarez, Rydz, and Diaz were some of the witnesses who offered the most devastating testimony against Marquez during the trial.

At some point during the trial, Marquez's counsel was transported to the hospital due to a condition that Marquez alleges was a stroke. She returned to trial after a few days and continued to serve as Marquez's attorney.

The jury returned its verdict on July 20, 2006, convicting Marquez, Battle, Jr., and Acuna of RICO conspiracy under both theories of liability. The jury found Marquez guilty as to each of the twenty-nine predicate acts listed in the first theory of liability.

On March 3, 2008, counsel filed a motion to "arrest judgment" under Federal Rule of Criminal Procedure 34[2] based on Marquez's purportedly improper extradition from Spain. Marquez, through counsel, argued that the United States violated the "rule of speciality." This rule provides that a requesting state may prosecute a person only for such offenses for which he or she was surrendered. *See United States v. Herbage*, 850 F.2d 1463, 1465 (11th Cir. 1988). Marquez further argued that his extradition violated the "rule of dual criminality," which provides that a person may be extradited only "when his actions constitute an offense in both the requesting and requested states." *Id.* With regard to the rule of speciality,

---

[1] Battle, Sr. was sentenced to twenty years' incarceration but died shortly after he was sentenced.

[2] Rule 34(a)(2) states that "the court must arrest judgment if the court does not have jurisdiction of the charged offense." Fed. R. Crim. P. 34(a)(2).

the motion claimed that Marquez was prosecuted for a charge for which he was not extradited: RICO conspiracy for collection of unlawful debt in violation of 18 U.S.C. § 1962(c). With regard to dual criminality, Marquez argued that the Spanish National Criminal Court incorrectly authorized his extradition because the investigator's affidavit was vague, making it impossible for the Spanish court to determine whether there was criminal continuity through and beyond 1999 to satisfy the Spanish statute of limitations. According to the motion, although Marquez was extradited to be prosecuted for crimes still continuing after 1999, he was actually prosecuted for crimes that ended before 1999. Marquez's dual criminality argument hinged upon his claim that he had withdrawn from the conspiracy by fleeing to Spain before the five-year statute of limitations on the RICO violation began running in March 1999. *See United States v. Pepe*, 747 F.2d 632, 663–64 (11th Cir. 1984) (the five-year statute of limitations prescribed in 18 U.S.C. § 3282 applies to RICO prosecutions).

At a hearing, the district court found that Marquez waived his rule of speciality and dual criminality objections because he did not raise them in a pretrial motion, which he was required to do by Federal Rule of Criminal Procedure 12, and he had no good cause for the delay.[3] However, the court also discussed and

---

[3] The district court reasoned that because a challenge to the validity of an extradition is a challenge to the court's personal jurisdiction over the defendant, and a challenge to personal jurisdiction is a claim of defect in the prosecution, the objections were required to be made in

rejected Marquez's arguments on their merits. The court found that the rule of speciality was not violated because the conduct for which the United States actually prosecuted Marquez was directly interconnected with the acts for which he was extradited. With respect to dual criminality, the court deferred to the Spanish National Criminal Court's conclusions that the conspiracy for which Marquez was prosecuted was criminal in both the United States and Spain and that Marquez could not assert Spain's statute of limitations because the statute of limitations had not expired under the laws of the requesting state.

Counsel also filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33, arguing, among other things, that the United States violated its discovery obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963); *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972); and the *Jencks Act*, 18 U.S.C. § 3500. The motion pointed out that Harold Marchena ("Marchena"), the ex-manager of the El Crillon casino in Peru and a witness during the United States's case-in-chief, had filed a post-trial affidavit in Marquez's ancillary criminal forfeiture proceedings alleging that Detective David Shanks ("Detective Shanks"), the United States's main case agent, had made "money promises" to him in exchange for his testimony. Marchena's affidavit

---

accordance with Rule 12, which requires a motion alleging a defect in the prosecution to be made before trial. Fed. R. Crim. P. 12(b)(3)(A).

explained that he had previously obtained a civil judgment in Peru against Marquez and Battle, Sr. for breach of his casino employment contract. Marchena attested that when he met with Detective Shanks and Robert O'Bannon ("O'Bannon"), an employee of the Diplomatic Security Service, about assisting them in Marquez's case, he asked them about his chances of collecting on his Peruvian judgment. According to Marchena, Detective Shanks had advised him to follow up on his Peruvian judgment in the United States, and O'Bannon gave him the number of a Miami attorney. Marchena retained that attorney to help in collecting his judgment. He filed a notice of lien in Marquez's criminal case before trial in which he made the same allegations but added that he had not spoken to the prosecutors about the "agreement" because he assumed that Detective Shanks was authorized to act for the United States. Counsel argued in Marquez's motion for new trial that had the United States disclosed the "money promises" Detective Shanks made to Marchena in discovery, she would have cross examined Marchena and Detective Shanks on their financial interests in obtaining a conviction. The district court denied Marquez's motion at a hearing, rejecting his claim that the United States violated any of its obligations to disclose evidence related to the alleged agreement.

On April 30, 2008, the district court sentenced Marquez to 240 months' incarceration and three years' supervised release and ordered him to pay $69,600

19

in restitution and a $100.00 special assessment. Battle, Jr. was sentenced to 188 months' incarceration and Acuna to life in prison.

Counsel timely filed a notice of appeal for Marquez, but she subsequently asked for and received a number of enlargements of time in which to file her initial brief. On April 30, 2009, the United States requested a hearing in aid of appeal before the district court in Marquez's criminal case pursuant to *United States v. McClain*,[4] requesting a determination on whether counsel was capable of representing Marquez on appeal. In support, the United States noted that on October 31, 2008, it had filed a civil action in the United States District Court for the Southern District of Florida seeking repayment of counsel's student loans that were overdue. The United States further noted that counsel failed to appear at a settlement conference in that case, prompting a show cause hearing, and at the hearing, counsel stated that she was suffering from severe depression. The United States also claimed in its motion that its counsel in the student loan case advised the court that counsel had told her that she may have had a mini-stroke during Marquez's trial and that is why she could not remember things. The United States

---

[4] 823 F.2d 1457 (11th Cir. 1987), *overruled on other grounds by United States v. Watson*, 866 F.2d 381, 385 n.3 (11th Cir. 1989). In *McClain*, this Court held that failure to advise a defendant that his attorney was under investigation before and during his trial by the same United States Attorney's Office that was prosecuting the defendant deprived him of a fair trial where the defendant was not advised of the conflict of interest. *Id.* at 1462–63.

further advised that the court had suspended counsel from the practice of law in the district.

On June 12, 2009, the district court conducted a *McClain* hearing with counsel and Marquez, who appeared telephonically. The court noted that counsel's pending student loan case had concluded with a final judgment against her. The court inquired whether counsel had informed Marquez of her student loan case, and both counsel and Marquez confirmed that she had. During this exchange, Marquez stated that he did not want counsel to continue to represent him "if she has those problems." The court ruled that the matter of counsel's continued representation should first be addressed by this Court but explained that its recommendation would be that it did not see any conflict of interest. The court noted that counsel's representation during trial and sentencing was thorough and competent, stating:

> I thoroughly remember trying this case for over six months, and I found at the time that Ms. Calzon had been very competent in the representation and that she was thorough and prepared on a daily basis to represent Mr. Marquez's interest and did so appropriately from everything I saw.
>
> Now, there were plenty of difficulties along the way in terms of money. In the beginning Mr. Marquez hired Ms. Calzon if I remember right . . . and ran out of money . . . to continue the representation at a time when this trial was set with multiple defendants and with all kinds of deadlines upon us, including investigations that were going on.

So it took quite an effort, but I was able to obtain funding through the CJA program to continue Ms. Calzon's representation, and so I was very involved with that representation because she had to present her bills to me and justify everything that she was doing.

So I have a very thorough understanding of what she was doing for her client, what services she needed in order to perform her duties . . .

The representation, as far as I'm concerned, was thorough at the time of trial and . . . sentencing . . .

So both in terms of the trial and the sentencing, as far as I could observe, Ms. Calzon was alert, involved, prepared and appropriate.

[Criminal Docket Entry No. 2960 at 11–13.]

On May 5, 2009, counsel filed the initial brief in Marquez's direct appeal before this Court. She argued that the district court erred when it denied Marquez's motion to arrest judgment, which challenged his extradition from Spain based upon speciality and dual criminality grounds, his motion for new trial, which argued that the United States violated its disclosure obligations related to the Marchena agreement, a motion alleging deprivation of a fair trial, which claimed that the court delayed disclosure of discovery that pertained to some witnesses, and a motion for severance or mistrial, which argued that the closing arguments of co-defendant Battle, Jr. were antagonistic to Marquez's theory of defense. This Court denied the direct appeals of Marquez's co-defendants, *United States v. Acuna*, 313 F. App'x 283 (11th Cir. 2009) (unpublished), and Marquez's direct appeal, *United*

*States v. Marquez*, 594 F.3d 855 (11th Cir. 2010). With regard to Marquez's

argument that the district court incorrectly denied his motion to arrest judgment,

this Court held that Marquez waived the challenge to his extradition by counsel's

failure to raise it in a pretrial motion and did not reach the merits. *Id.* at 858–59.

The Supreme Court denied Marquez's petition for a writ of certiorari on June 1,

2010. *Marquez v. United States*, 560 U.S. 947, 130 S. Ct. 3373 (2010).

On May 5, 2010, Marquez filed a motion to appoint counsel for purposes of

filing his § 2255 motion. The motion was granted, as was a motion to appoint a

second attorney to assist with the § 2255 motion. On June 1, 2011, Marquez filed

his § 2255 motion. Marquez alleged he received ineffective assistance of counsel

based on counsel's (1) failure to timely challenge his extradition from Spain; (2)

failure to advise him concerning his options for pleading guilty; (3) suffering a

mid-trial stroke and depression and then blaming Marquez for her downfall which

prejudiced him at closing and also in her failure to raise meritorious issues on

appeal; (4) never meeting with Marquez to discuss the case which caused her to

make numerous trial errors resulting in his convictions; and (5) failure to advise

him on his Fifth Amendment right to testify. The United States attached counsel's

affidavit, which responded to Marquez's allegations, in support of its response in

opposition to the § 2255 motion. On June 17, 2013, a United States magistrate

judge entered an 83-page report recommending Marquez's § 2255 claims be

23

denied without an evidentiary hearing. Marquez objected to the report and recommendation, the United States responded, and Marquez replied. On September 30, 2014, the district court issued a twenty-page order adopting the magistrate judge's report and recommendation to deny Marquez's § 2255 motion. The district court concluded that upon *de novo* review and upon taking the facts alleged in Marquez's § 2255 motion, except for those facts conclusively refuted by the record, as true, Marquez was not entitled to relief as a matter of law and thus an evidentiary hearing was not warranted. However, the district court granted Marquez a certificate of appealability "on the issue of whether counsel Calzon was ineffective at trial and on appeal."

This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

## A.

As Marquez frames it, the only issue on appeal is whether the district court's denial of his request for an evidentiary hearing on the ineffective assistance of counsel claims in his § 2255 motion was error. This Court reviews a district court's denial of an evidentiary hearing on a § 2255 motion for abuse of discretion. *Aron v. United States*, 291 F.3d 708, 714 n.5 (11th Cir. 2002). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a

determination, or makes findings of fact that are clearly erroneous." *Winthrop-Redin v. United States*, 767 F.3d 1210, 1215 (11th Cir. 2014) (quoting *Citizens for Police Accountability Political Comm. v. Browning*, 572 F.3d 1213, 1216–17 (11th Cir. 2009) (per curiam)).

A federal prisoner may bring a collateral challenge to his sentence by moving the court to vacate, set aside, or correct the sentence. 28 U.S.C. § 2255(a). "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." *Id.* § 2255(b). "[I]f the petitioner 'alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of his claim.'" *Aron*, 219 F.3d at 714–15 (quoting *Holmes v. United States*, 876 F.2d 1545, 1552 (11th Cir. 1989)). "However, a district court need not hold a hearing if the allegations are 'patently frivolous,' 'based upon unsupported generalizations,' or 'affirmatively contradicted by the record.'" *Winthrop-Redin*, 767 F.3d at 1216 (quoting *Holmes*, 876 F.2d at 1553); *see, e.g.*, *Lynn v. United States*, 365 F.3d 1225, 1239 (11th Cir. 2004) ("Because the . . . affidavits submitted by Lynn amount to nothing more than mere conclusory allegations, the district court was not required to hold an evidentiary hearing on the issues and correctly denied Lynn's § 2255 motion.").

The Sixth Amendment guarantees criminal defendants a right to "reasonably effective" legal assistance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). A defendant seeking relief on the basis of ineffective assistance of counsel must thus demonstrate that counsel's performance failed to meet "an objective standard of reasonableness." *Id.* at 688, 104 S. Ct. at 2064. "The proper measure of attorney performance [is] reasonableness under prevailing professional norms." *Id.*, 104 S. Ct. at 2065. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S. Ct. at 2065. Courts should presume counsel was effective and must avoid second-guessing counsel's performance with the benefit of hindsight. *Id.* Additionally, because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment," *id.* at 691, 104 S. Ct. at 2066, the defendant must also establish that his rights were prejudiced as a result of the attorney's substandard performance. *Id.* at 692, 104 S. Ct. at 2067. The prejudice requirement has been met when the petitioner has shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068. A court may decline to reach the performance prong of *Strickland*'s test if it is convinced that the prejudice prong has not been be satisfied. *Id.* at 697, 104 S. Ct. at 2069.

**B.**

First, Marquez argues that the district court abused its discretion in denying his ineffective assistance of counsel claim without an evidentiary hearing because his counsel failed to timely challenge the validity of his extradition from Spain. We are not persuaded.

We note that we need not decide whether counsel's failure to raise the rules of speciality and dual criminality objections until well after Marquez was convicted constitutes deficient performance under *Strickland* because Marquez cannot show that his objections would have been granted by the district court even if they were timely filed. This Court has explained that "specialty is a doctrine based on international comity. Because the surrender of the defendant requires the cooperation of the surrendering state, preservation of the institution of extradition requires that the petitioning state live up to whatever promises it made in order to obtain extradition." *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1305 (11th Cir. 2000) (quoting *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986)). However, this Court has clarified that "[r]ather than mandating exact uniformity between the charges set forth in the extradition request and the actual indictment, '[w]hat the doctrine of specialty requires is that the prosecution be based on the same facts as those set forth in the request for extradition.'" *Id.* (quoting *United States v. Sensi*, 879 F.2d 888, 895–96 (D.C.Cir. 1989)) (internal quotation marks

omitted); *see also United States v. Saccoccia*, 58 F.3d 754, 767 (1st Cir. 1995) ("[O]beisance to the principle of speciality does not require that a defendant be prosecuted only under the precise indictment that prompted his extradition or that the prosecution always be limited to specific offenses enumerated in the surrendering state's extradition order.") (citations omitted). Rather, the question is "whether, under the totality of the circumstances, the court in the requesting state reasonably believes that prosecuting the defendant on particular charges contradicts the surrendering state's manifested intentions," or "whether the surrendering state would deem the conduct for which the requesting state actually prosecutes the defendant as interconnected with (as opposed to independent from) the acts for which he was extradited." *Saccoccia*, 58 F.3d at 767.

As the district court recognized in rejecting Marquez's speciality argument in his motion to arrest judgment, the facts set out in the Spanish National Criminal Court's *en banc* order authorizing his extradition stated that Marquez was involved in a conspiracy involving illegal gambling and betting. Prosecution for RICO conspiracy based on collection of unlawful gambling debt was integrally connected to those facts. Additionally, Marquez was extradited and prosecuted on the same charge: RICO conspiracy in violation of 18 U.S.C. § 1962(d). Rather than add a new count, the superseding indictment merely clarified that the newly-detailed theory of collection of unlawful debt was an alternative theory of liability under the

28

still-existing Count I RICO conspiracy charge that already included the racketeering theory. Indeed, being charged with a RICO conspiracy, Marquez was already liable for the foreseeable acts of his co-defendants, including the unlawful collection of debt. Thus, the addition of the collection of unlawful debt theory did not materially alter the offense for which Marquez was extradited and did not violate the rule of speciality. Because the district court would not have granted Marquez's speciality objection if it had been timely filed (and in fact rejected it on its merits as an alternative reason to deny his motion to arrest judgment), he cannot show that counsel's failure to raise it before trial prejudiced him. Further, even if Marquez could establish that counsel would have been successful in convincing the court that the United States should not be allowed to prosecute him for RICO conspiracy based on the collection of unlawful debt theory, he cannot show that the outcome of his trial would have been different because the jury found Marquez guilty of RICO conspiracy under both of the two alternative theories of liability: a pattern of racketeering activity and collection of unlawful debt. Thus, even setting aside the collection of unlawful debt as one theory of liability, Marquez would still have been prosecuted and found guilty for RICO conspiracy under the pattern of racketeering activity theory of liability, resulting in the same outcome.

Marquez's dual criminality argument similarly fails. While the rule requires that the conduct for which the defendant is extradited be an offense in both the

requesting state and the extraditing state, *see Gallo-Chamorro*, 233 F.3d at 1306, it "does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312, 42 S. Ct. 469, 470–71 (1922).

We have no doubt that the conduct for which Marquez was extradited to the United States for committing is criminal in both the United States and Spain. The Spanish court itself recognized that the charge involved a mafia organization engaged in activities characteristic of organized crime, stated that the facts in the extradition request "are perfectly definable under Spanish criminal law," and even identified Spanish statutes under which Marquez could be prosecuted for the same conduct. The Spanish court's analysis would not have differed had it been presented with the superseding indictment because it did not add a new count or materially alter the offense for which Marquez was charged. The Spanish court also rejected Marquez's argument that Spanish law barring prosecution for crimes committed before 1999 meant that the charged RICO conspiracy was not criminal in Spain, concluding *en banc* that as long as the limitations period had not expired under U.S. law, he could not assert a dual criminality argument based on Spain's statute of limitations. In denying Marquez's post-trial challenge to his extradition

30

on dual criminality grounds, the district court deferred to the Spanish court's explanation and application of Spanish law regarding dual criminality, rejecting Marquez's argument that the Spanish court incorrectly authorized his extradition, and noted that the statute of limitations for the RICO conspiracy had not expired. Marquez has not demonstrated that the district court would have reached a different conclusion had it been presented with this motion prior to trial. Indeed, the indictment charged that the conspiracy continued to operate well past the March 1999 commencement of the statute of limitations, and the evidence at trial established that Marquez and the other owners of the Corporation continued to hide assets and dispose of ill-gotten gains up to the point of their arrests in 2004.

Marquez has not presented any factual dispute that would have been appropriate for an evidentiary hearing on this claim. Because the district court's rejection of Marquez's rule of speciality and dual criminality arguments was made on purely legal grounds, no evidentiary hearing was warranted.

## C.

Next, Marquez claims that counsel was ineffective for failing to communicate the United States's twenty-year plea offer to him or entering into plea negotiations on his behalf. Again, we are unpersuaded that the district court abused its discretion in refusing to hold an evidentiary hearing on this claim.

*Strickland*'s two-part test applies in determining whether counsel was ineffective during the plea process. *Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995). Marquez must show not only deficient performance by counsel but also "a reasonable probability that, but for counsel's errors, he would . . . have pleaded guilty and would [not] have insisted on going to trial." *Id.* (quoting *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985)) (alterations in original).

Early in the trial the United States read into the record that Battle, Sr., Battle, Jr., and other co-defendants had all rejected plea offers and further stated that it had extended an offer to Marquez as well:

| The Prosecutor: | . . . Approximately two weeks ago, the United States went ahead and conveyed plea offers to Battle, Sr., Battle, Jr., Gustavo Battle, and Argelio Jiménez. Since then I have not heard any response, which is fine as far as that's concerned, but it's getting to the point where the Government is going to go ahead and withdraw that plea agreement. I just wanted to put on the record that the defendants are aware that this plea offer has been made. There's no doubt in my mind that the plea offers have been conveyed to them. What I don't want is to have a situation, you know, a year down the road where somebody files a 2255 saying, you know, "I never heard of the Government offering any plea offer to us." |
| --- | --- |
| The Court: | So, there hasn't been any plea offer to Mr. Marquez? |
| The Prosecutor: | At this time? Well there was an initial plea offer that was made to Mr. Marquez. I have not had any more discussion with Ms. Calzon concerning that. |

32

|  | She has not returned to me one way or another with regard to that. |
|---|---|
| The Court: | All right, sir. So, that's on record. |

. . .

|  |  |
|---|---|
| Ms. Calzon: | Your Honor, the only thing I would like to comment on the question that you asked the Government regarding a plea for my client [Marquez], and I join Mr. Blumenfeld and I want the record clear that we don't consider pleading straight up to the charges a plea agreement, a plea offer, so we have not been offered anything that my client [Marquez] can consider. |

[Criminal Docket Entry No. 1846 at 104–05]. This exchange was made in open court, and there is nothing in the record to indicate that Marquez was not present for this exchange. Thus, the record refutes Marquez's assertion that he was unaware of the twenty-year offer. Further, nowhere does the record reflect that Marquez protested that counsel had not communicated the offer to him or that he wanted to plead guilty. However, in the event that Marquez was not present for the above exchange and was otherwise unaware that the Government had communicated such an offer, he still cannot establish *Strickland* prejudice because twenty years' imprisonment is the sentence he actually received following trial. So even if Marquez had accepted the twenty-year plea offer, the outcome of his proceeding would not have been different.

Marquez fares no better on his claim that counsel failed to advise him to plead guilty "straight-up" to the indictment: that is, plead guilty without a plea agreement or enter into a "blind plea." Marquez theorizes that had he so pled, counsel could have attempted to convince the district court to sentence him to fewer than twenty years' imprisonment. We need not decide whether failing to advise a client that he has the option to plead guilty without a plea agreement constitutes deficient performance under *Strickland* because on this record there is simply no "reasonable probability" that the district court would have agreed to sentence Marquez to fewer than twenty years if he had pled guilty. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. The district court expressed its frustration that Marquez could not receive a sentence of more than twenty years' imprisonment pursuant to the terms of his extradition while other similarly culpable co-defendants involved in the same predicate acts of murder and arson faced life sentences:

| | |
|---|---|
| The Court: | Hold for a second. As to Mr. Marquez, is there a limitation by treaty? |
| The Prosecutor: | The limitation is by treaty but it's also by *Apprendi*. Because of the treaty, we never listed Mr. Marquez in the life enhancer section. |
| The Court: | So, the most he could get is 20 years. |
| The Prosecutor: | The most he can get is 20 years. |

The Court:    So, the irony here is you're saying Mr. Marquez was the guy who was paying the money, knew about the fires, played an active role, actively participated, he can't get more than 20 years, but Mr. Battle, Jr., who didn't want any part of the business, would then get up to life. Is that what you're saying.

The Prosecutor:    It's our position that Mr. Battle, Jr., was the one that was paying the money out of the UNESCO account.

The Court:    I mean, where's the equity in that or the sentencing disparity?

[Civil Docket Entry No. 12–21 at 238]. Additionally, the court stated at Marquez's sentencing that his role in the conspiracy warranted a twenty-year sentence, which it described as falling "well below the advisory guidelines range." [Criminal Docket Entry No. 2900 at 19.] The court further explained what the evidence showed at sentencing, noting that Marquez "was a member of a hierarchy of a violent RICO enterprise and that enterprise did engage in murder, arsons and assaults, money laundering and illegal gambling"; that he "directly participated in many of these violent acts, including the premeditated murder of Jose Enriquez, and was found by the jury responsible for various arsons and arson-related murders"; and that he "lived most of the majority of his adult life committing these crimes on a regular basis and according to the evidence at trial, even with regard to the serious arsons and the like, he did so without remorse." [*Id.* at 19–20].

35

Additionally, Marquez's sentence was in accord with the sentences of his similarly culpable co-defendants Battle, Sr. (240 months), Battle, Jr. (188 months), and Acuna (life), all of whom, like Marquez, were in the hierarchy of the RICO conspiracy. While Marquez lists a number of co-defendants who received lesser sentences, such as the Corporation's accountant, Vidan, he does not discuss the evidence relating to their roles in the RICO conspiracy, and in any event, the district court was in the best position to judge the relative culpability of the defendants.

Marquez ignores trial evidence that established that Battle, Sr. put in place the ruthless policies of the enterprise, and that Marquez executed these policies by running the day-to-day operations of the Corporation in New York, which included ordering and paying for at least ten murders and for arsons that resulted in at least eight deaths. Marquez also provided a silencer-equipped firearm to Guzman, an enterprise enforcer, to use in the murder of Enriquez. Battle, Sr. and Marquez both committed callous acts in furtherance of the conspiracy, and they both received twenty-year sentences. Marquez argues that had he pled guilty, the court would not have had the evidence of Marquez's participation in the arsons or murders or his lack of remorse to consider at the time of sentencing. We note however, that Alvarez, Rydz, and Diaz, the most ruinous witnesses against Marquez at trial, would likely still have given the same testimony at Marquez's sentencing, either

36

directly or through an interviewing agent testifying to reliable hearsay. Consequently, the court would have had that information at sentencing.

Because the record conclusively refutes Marquez's allegation that had counsel advised him to plead guilty, he would have received a lesser sentence, the court did not abuse its discretion in refusing to hold an evidentiary hearing to resolve this particular ineffective assistance of counsel claim.

**D.**

Marquez also claims that counsel suffered a stroke during his trial, fell into depression due to various personal and financial issues, and blamed her problems on him and the toll his case had taken on her. He asserts that these conditions prevented her from effectively representing him in closing argument and on appeal. We do not agree.

The fact that an attorney has a mental or physical health problem is not inherently prejudicial; rather, a court must evaluate whether the condition manifests itself in counsel's actual conduct in some detrimental manner. *See White v. Singletary*, 972 F.2d 1218, 1222 (11th Cir. 1992) ("Although it is undisputed that [counsel] had health problems, the district court specifically found that none made his legal assistance constitutionally ineffective."); *Messer v. Florida*, 834 F.2d 890, 897 (11th Cir. 1987) ("Being tired, alone, 'does not establish ineffectiveness. There must be some showing [counsel] committed errors because

of his condition.'") (quoting *King v. Strickland*, 714 F.2d 1481, 1489 (11th Cir. 1983), *vacated,* 467 U.S. 1211, 104 S. Ct. 2651 (1984), *opinion reinstated on remand,* 748 F.2d 1462 (11th Cir. 1984) (citation omitted)); *Buckelew v. United States*, 575 F.2d 515, 520–21 (5th Cir. 1978) (there was no merit in petitioners' allegations that their trial attorney was "too old and sick" to represent them, especially since petitioners made no adequate allegation of specific prejudice resulting from counsel's supposed illness).

With regard to the claim that counsel's mid-trial stroke caused her to deliver a deficient closing argument, Marquez merely made the general allegations to the district court that her closing failed to delve into sufficient details, failed to address issues of witness credibility, failed to highlight exculpatory evidence, and instead merely relied upon general principles of fairness and Marquez's relationship with the Battle family. In rejecting the claim, the district court noted that counsel's closing argument had in fact been "lucid and cogent" and that she covered several pieces of evidence in detail during the one day she was allotted for closing, including: (1) reciting Rydz's testimony regarding Enriquez's murder and urging the jury to find that Marquez was not involved in that murder;[5] (2) pointing out the inconsistent testimony of Diaz to show that Marquez was not involved in the

---

[5] Counsel recited Rydz's testimony in which he said, "I did it. I paid for it. I paid Earl or Gordon a $100,000 for killing my friend, Mr. Sr.'s brother." [Civil Docket Entry No. 12–21 at 223–24.]

arsons; and (3) attacking the veracity of Alvarez's testimony. But fatal to Marquez's claim, according to the district court, was that Marquez did not specify what counsel could have said that would have changed the result of the proceedings, so he failed to set forth facts which, if true, would lead to a ruling in his favor.

Now Marquez claims that counsel should have spent more time emphasizing that Robinson had provided Rydz with an assassin to murder Enriquez in Miami and an evidentiary hearing was needed to establish whether this would have persuaded the jury that Marquez was not involved in the murder plot. Assuming this argument is properly before us,[6] we first note that statements made during closing argument are generally the result of counsel's strategic decisions and are thus reviewed with a high degree of deference and without the distorting effects of hindsight. *See, e.g.*, *McNeal v. Wainwright*, 722 F.2d 674, 676–77 (11th Cir. 1984) (counsel was not ineffective for conceding to manslaughter during closing argument). Aside from pointing out that strokes often cause memory loss, problems focusing, and mood swings, Marquez has not demonstrated that any condition counsel may have suffered negatively impacted his trial. Indeed, that Rydz ultimately decided to hire an outsider to murder Enriquez does not negate the

---

[6] Although arguments not presented below are generally not reviewed, *see Walker v. Jones*, 10 F.3d 1569, 1572 (11th Cir.1994), we will assume that this claim is a mere expansion of the argument made below that counsel did not mention evidence showing that Marquez was not involved in Enriquez's murder.

overwhelming evidence showing that Marquez was involved in the murder plot, such as the fact that after Battle, Sr. had put a contract on Enriquez's life, Marquez, who managed the RICO enterprise's enforcement actions, provided Guzman, an enterprise enforcer, with a silencer-equipped gun that could be used in Enriquez's murder, whether committed by Guzman or someone else. Additionally, the Enriquez murder was only one of twenty-nine predicate acts that Marquez was found guilty of committing, and he would have been convicted of RICO conspiracy based upon other overwhelming evidence pertaining to his commission of the other predicate acts alleged in the indictment. Accordingly, Marquez has failed to establish either of *Strickland*'s two requirements for a prima facie ineffective assistance of counsel claim warranting an evidentiary hearing.

With regard to Marquez's claim that counsel's condition caused her to file an appellate brief lacking key arguments, we again find that the record obviated the need for an evidentiary hearing. We first note that although counsel suffered personal and financial problems during the time that Marquez's case was on appeal, she did in fact file an appellate brief raising four issues, including challenging Marquez's extradition from Spain and arguing that the United States violated its disclosure obligations during trial. *Strickland*'s test also applies to ineffective assistance of appellate counsel claims. *Smith v. Robbins*, 528 U.S. 259, 285–86, 120 S. Ct. 746, 764 (2000). However, "a criminal defendant's appellate

40

counsel is not required to raise all nonfrivolous issues on appeal." *Payne v. United States*, 566 F.3d 1276, 1277 (11th Cir. 2009) (per curiam) (citing *Jones v. Barnes*, 463 U.S. 745, 751–54, 103 S. Ct. 3308, 3312–14 (1983)); *see also Jones*, 463 U.S. at 751–52, 103 S. Ct. at 3313 ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). "Therefore, it is difficult for a defendant to show his counsel was ineffective for failing to raise certain issues on appeal, particularly if counsel did present other strong issues." *Payne*, 566 F.3d at 1277 (citing *Smith*, 528 U.S. at 287–88, 120 S. Ct. at 765–66).

Marquez claims that counsel should have argued on appeal that the district court erred in admitting evidence concerning the El Crillon casino in Peru because it was irrelevant and unfairly prejudicial. However, the superseding indictment charged Marquez and his co-defendants with engaging in money laundering to conceal their criminal activities; thus the casino evidence was relevant under Federal Rule of Evidence 401 to show that the casino was used to launder illegal bolita proceeds. We are also not persuaded that the evidence was unduly prejudicial under Federal Rule of Evidence 403 because, as Marquez represents, most of the evidence presented at trial was that he was a "nice guy" who never threatened anybody. On this record, we cannot say that it was deficient

performance for counsel to conclude Marquez would likely not be successful in challenging the admission of the casino evidence on appeal.

Marquez also faults counsel for not making various arguments about the reasonableness of his sentence. He first says that counsel should have re-argued on appeal the same argument she made at sentencing which was that his sentence violated the terms of his extradition, which prohibited life sentences, because a twenty-year sentence is a *de facto* life sentence. As the district court found when counsel raised this argument at Marquez's sentencing, the Spanish extradition documents do not prohibit a twenty-year sentence, and because the Spanish court had been aware of Marquez's age when he was extradited, it could have imposed a further limitation on his sentence but elected not to do so. A reasonable attorney could certainly decide not to continue with this argument on appeal because it is contradicted by the record. Marquez now argues for the first time that he should have had an evidentiary hearing because he was extradited in 2005 but not sentenced until 2008, and a hearing would have established that, if the Spanish court had known that he would become physically ill due to the stress of the criminal proceedings after his extradition, it would have required a fewer-than-twenty-year cap on his sentence as a term of extradition because, by 2008 when he was sentenced at age sixty-two, a twenty-year sentence effectively constituted a life sentence for him. We need not delve into the many reasons this claim fails

because Marquez did not present it to the district court. *See Walker*, 10 F.3d at 1572–73.

Next, Marquez argues that because the evidence showed that Battle, Sr. was more culpable than he but received the same sentence, he was prejudiced by counsel's failure to argue on appeal that his sentence was substantively unreasonable. Marquez again ignores the overwhelming evidence showing that although Battle, Sr. founded the Corporation and established its merciless policies, Marquez executed the policies, including ordering and paying for at least ten murders and arsons that resulted in at least eight deaths. Any argument that Marquez was not as culpable as Battle, Sr. would have been contradicted by the record and thus would have failed on appeal.

Finally, Marquez claims that counsel should have raised the same sentencing guideline arguments that counsel for Battle, Jr. raised, unsuccessfully, on appeal. This Court declined to resolve Battle, Jr.'s guideline arguments, noting that the district court had stated that it would impose the 188-month sentence through an upward departure regardless of the guidelines sentence, and holding that the sentence achieved through application of the 18 U.S.C. § 3553(a) factors was reasonable. *See Acuna*, 313 F. App'x at 298. Marquez does not explain how he would have been successful on such arguments when Battle, Jr. wasn't.

43

Marquez also argues that counsel should have raised the same statute of limitations argument that counsel for Battle, Jr. raised, unsuccessfully, on appeal because Marquez was in a better position than Battle, Jr. to make the argument. In rejecting Battle, Jr.'s argument, this Court explained that the mere fact that he and Rydz announced in 1988 that they wanted to cease receiving direct profits in exchange for overseeing the daily operations of bolita did not establish Battle, Jr.'s withdrawal from the conspiracy before the statute of limitations began to run in March 1999. *See Acuna*, 313 F. App'x at 294. Rather, the evidence at trial established that in 2001, Battle, Jr. sold his home purchased with illegal gambling proceeds and then concealed the profits through various real estate transactions and sham bank accounts. *See id.* at 294–95. These actions demonstrated Battle, Jr.'s continued personal participation in the ongoing conspiracy because concealment of the illegal gambling proceeds protected and promoted the RICO enterprise by preventing the detection of its criminal activities and the imposition of civil and criminal liabilities upon its members. *See id.* Like Battle, Jr., Marquez sold his home purchased with illegal gambling proceeds in November 1999, using the profits to pay off debt and fund his life in Spain until his extradition in 2005. The same rationale would have been applied to Marquez's conduct, defeating his statute of limitations argument.

Marquez's final point of contention with counsel's appellate performance is that she did not contest the admission at trial of transcripts of Spanish wiretaps that he alleges contained errors when they were translated into English. Marquez's failure to identify a single inaccuracy in those transcripts dooms his claim. He has not established how such an argument on appeal would have resulted in a reversal of his conviction.

Although counsel did not raise on appeal the issues that Marquez believes would have been meritorious, we find nothing objectively unreasonable about counsel's decision to raise the four issues she felt were the strongest. Marquez has not demonstrated that suffering a stroke, being depressed, or having financial problems negatively impacted her ability to represent him. Accordingly, we also find no merit in Marquez's claim of ineffective legal representation on appeal.

### E.

We interpret Marquez's fourth ineffective assistance of counsel claim as one of failure to investigate possible defenses. He alleges that because counsel did not meet and confer with him prior to and during trial, she did not learn that she should cross examine Marchena and Detective Shanks about the alleged "money promises" Detective Shanks made to Marchena in exchange for his testimony. Marquez also asserts that counsel should have investigated Diaz's testimony from Pons's 1980 trial for the arsons to enforce the two-block rule, including cross

examining Diaz with the transcript of his prior testimony to show that he failed to implicate Marquez in the fires.

Marquez asserts that the notice of lien Marchena filed before trial should have triggered counsel to investigate this alleged agreement between Marchena and Detective Shanks, which would have later prepared her to cross examine Marchena on his financial interest in obtaining a conviction and Detective Shanks on the "lengths he would go to to get a conviction." While counsel certainly has a duty to undertake a reasonable investigation into possible defenses or to make a reasonable decision that certain investigations are not needed, *see Strickland*, 104 S. Ct. at 2066, the district court was not required to hear evidence as to the scope of counsel's pretrial investigation because Marquez cannot establish that he was prejudiced by counsel's failure to cross examine Marchena and Detective Shanks on these topics.

As an initial matter, there is nothing in the record substantiating Marchena's claim that there was an oral agreement between him and Detective Shanks and O'Bannon, where Marchena would testify and O'Bannon and Detective Shanks would insure he would collect on his judgment. Indeed, the United States later moved to strike Marchena's affidavit in the post-trial forfeiture proceedings. Marquez has not demonstrated how counsel cross examining the detective on an unsubstantiated agreement would have changed the outcome of the trial.

46

Marquez's speculation that "one never knows what a jury relies on for its convictions and Detective Shanks was the lead detective on this case," does not demonstrate prejudice, especially considering that the jury determined that Marquez had committed numerous other predicate acts, including murder and arson, which were totally unrelated to the casino, Marchena's financial interest in the case, or to any alleged agreement between Marchena and Detective Shanks. We agree with the district court's conclusion that, based upon the entire trial record, the jury's verdict would not have been affected even if Detective Shanks's credibility had been impugned.

Nor can Marquez establish that the outcome of his trial would have been different had counsel cross examined Marchena on his financial interest in the forfeited properties because co-defendant Battle, Sr.'s counsel had cross examined Marchena on this same topic before Battle, Sr. pled guilty. Any further cross examination by Marquez's counsel would have been merely cumulative[7] and indeed, Battle, Sr.'s counsel's impeachment of Marchena's testimony was sufficient to allow Marquez's counsel to argue in closing that Marchena sought to collect on his outstanding judgment through the criminal case. Marquez's counsel

---

[7] Although we need not reach the question whether an attorney's performance is deficient when she fails to cross examine a witness whose testimony has already been impeached, we note that a reasonable attorney could certainly make the strategic decision not to do so because additional cross examination may give the witness the additional opportunity to explain away problematic testimony. "The decision as to whether to cross-examine a witness 'is a tactical one well within the discretion of a defense attorney.'" *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) (quoting *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985)).

stated in closing, "[Marchena] has an ulterior motive. He has a reason to lie to you." [Civil Docket Entry No. 12–21 at 219.]

Marquez now argues for the first time that he was prejudiced because the jury could have relied on Marchena's testimony about the casino to find that Marquez's criminal conduct continued through the commencement of the statute of limitations period and that without this testimony, "the statute of limitations would have run on all of the charges before the Court." If we were to consider this claim, which we will not because Marquez did not present it to the district court, *see Walker*, 10 F.3d at 1572, we would find that it fails to comprehend that evidence that had nothing to do with the casino established Marquez's continued participation in the RICO conspiracy after March 1999, and in any event, it is factually inaccurate because the laundering of RICO proceeds through the casino ceased upon the casino's closure in 1996. Because Marquez's statute of limitations argument would have failed for reasons that had nothing to do with counsel's failure to question witnesses about the casino in Peru, he has failed to establish prejudice.

With regard to Diaz, counsel did in fact tell the jury at closing that Diaz did not implicate Marquez in the fires during Pons's trial:

| Counsel: | . . . Willie Diaz admitted to you that he had testified in many trials before he testified here. Remember that? |

48

|  | Well, what he failed to say in all those other trials, in all that other testimony, was that Mr. Marquez had anything to do. |
|---|---|
| The Prosecutor: | Objection, Your Honor. It assumes facts not in evidence. |
| The Court: | I'll let the jury sort that out. Overruled. |
| Counsel: | I asked him. All of a sudden, after decades of testifying, now Mr. Diaz remembers a chance encounter meeting Mr. Marquez. Never before. He testified against many other people about these same facts, about the same fires, about his same conduct, and never once did he say, "Oh, no, it wasn't Willie Pons. It was Mr. Marquez that did this and he told me you're doing a good job." |
|  | Never once in decades of testimony. |
|  | Now, do you consider that? Of course you consider it because that's something he failed to say or do. |

[Civil Docket Entry No. 12–21 at 183.] These statements refute Marquez's allegation that counsel failed to investigate Diaz's prior inconsistent testimony. While Marquez argues that directly impeaching Diaz by asking him to read his prior trial testimony[8] would have been a more effective means of proving he was lying than merely mentioning the fact during closing, counsel's strategic trial decisions are entitled to deference under *Strickland*. *Fugate*, 261 F.3d at 1219; *see*

---

[8] Marquez neither produced these transcripts from Pons's trial to the district court nor directed the court to any information regarding their whereabouts.

49

*also Chandler v. United States*, 218 F.3d 1305, 1318 n. 22 (11th Cir. 2000) ("How a lawyer spends his inherently limited time and resources is also entitled to great deference by the court."). And counsel did cross examine Diaz, establishing that Marquez never mentioned the word "fires" to him, that he received immunity for his testimony in this case, and that he was threatened by the United States to testify. *See Fugate*, 261 F.3d at 1220 ("Ineffective assistance . . . will not be found merely because 'other testimony might have been elicited from those who testified.'") (quoting *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (en banc)) (quotation marks omitted). Indeed, counsel's strategy may have been to avoid pressing Diaz about his testimony at Pons's trial for fear Diaz would say that he had not implicated Marquez because he had feared violent reprisal. The state court trial was in 1980 when the Corporation was still operating. *See Waters*, 46 F.3d at 1512 ("There is much wisdom for trial lawyers in the adage about leaving well enough alone."). For all of these reasons, Marquez has not shown that counsel's performance in this regard was constitutionally deficient.

Nor can Marquez establish *Strickland* prejudice. The testimony at trial was overwhelming that Marquez was involved in the arsons. Alvarez testified that it was Marquez who discussed with Battle, Sr. committing the arson that resulted in a baby's death and who ensured that Pons and Guzman were paid their salaries while they were either in jail or in hiding after being investigated for this arson. Rydz

testified that Marquez was directly involved with the Corporation's burning out of rival stores and that he had several conversations with Marquez about the Corporation's arsons, including the arson that resulted in the baby's death, and Marquez's answer was always "what is done is done." Additionally, the jury found that Marquez was culpable with regard to twenty other predicate acts that did not involve arson, and so if these nine arsons were somehow removed as predicate acts, Marquez would still have been found to have entered into an agreement to participate in twenty other predicate acts and, thus, would still be guilty.

## F.

Marquez's final argument is that the district court abused its discretion in failing to hold an evidentiary hearing to determine whether counsel was ineffective because she did not "meaningfully" counsel him regarding his right to testify. This claim fails as well.

"[A] criminal defendant has a fundamental constitutional right to testify in his or her own behalf at trial. This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel." *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992) (en banc) (emphasis omitted), *cert. denied*, 506 U.S. 842 (1992). A claim of ineffective assistance of counsel is "the appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel." *Id.* at 1534. If an attorney has refused to call a defendant to the

stand despite his desire to testify, or if she never informed him of his right to testify and that the decision belonged to him alone, she "has not acted within the range of competence demanded of attorneys in criminal cases." *Id.* (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064) (quotation marks omitted).

Because the record conclusively refutes Marquez's allegation that counsel deprived him of his right to testify, he cannot establish *Strickland*'s first requirement that counsel's performance was deficient. Marquez told the district court during trial that he had, in fact, decided not to testify after he had discussed his rights and options with counsel:

> The Court: All right. I would ask the defendants to be sworn at this time.
>
> [The defendants were duly sworn]
>
> The Court: Mr. Battle, Jr., let me start with you, sir. You have a right to testify in your own behalf if you elect to do so. What I need to do is inquire if you have had a full and complete opportunity to consider that right, discuss it with your attorneys and whether the decision not to testify is yours and yours alone.
>
> Battle, Jr.: It is, sir.
>
> . . .
>
> The Court: And, Mr. Marquez, the same question to you, sir.
>
> Marquez: Yes, sir.
>
> The Court: And this was done after having full opportunity to discuss this issue with Ms. Calzon.

Marquez:    Yes, sir.

[Criminal Docket Entry No. 2306 at 82–83.] "Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S. Ct. 1621, 1629 (1977). Because the record conclusively refutes Marquez's claim, the district court did not abuse its discretion in failing to hold an evidentiary hearing on this claim.

## III.

As to each of Marquez's ineffective assistance of counsel claims, the record unambiguously establishes that Marquez is entitled to no relief. As such, the district court did not abuse its discretion in denying Marquez's § 2255 motion without an evidentiary hearing.

**AFFIRMED.**